**Roger Allen JASKE, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 48S00–8608–CR–782.

Supreme Court of Indiana.

June 1, 1989.

William D. McCarty, Anderson, for appellant.

Linley E. Pearson, Atty. Gen., Gary Damon Secrest, Deputy Atty. Gen., Indianapolis, for appellee.

DICKSON, Justice.

A jury found defendant-appellant Roger Allen Jaske guilty of involuntary manslaughter, a class C felony, Ind.Code § 35–42–1–4, and battery, a class C felony, Ind.Code § 35–42–2–1. In a subsequent proceeding, the same jury found the defendant to be a habitual offender pursuant to Ind.Code § 35–50–2–8. The trial court entered convictions upon the jury's findings and sentenced the defendant to eight years for the involuntary manslaughter conviction, enhanced by thirty years based upon the jury's determination of the defendant's habitual offender status, and eight years for the battery conviction, the sentences to run concurrently. Pursuant to Ind.Code § 35–50–1–2, the trial court ordered the defendant's sentence for the instant case served consecutively to any sentence being served by the defendant at the Indiana Department of Correction.[1]

The following issues presented for review in this direct appeal are regrouped for discussion as follows:

1) sufficiency of the evidence;

2) double jeopardy;

3) testimony of Terry Horn;

4) admissibility of evidence concerning beating of Jeffrey Harmon; and

5) habitual offender determination.

### 1. Evidence Sufficiency

We first consider the defendant's attack upon the sufficiency of the evidence to sustain his convictions for involuntary manslaughter and battery. In addressing the sufficiency issue, we will affirm the conviction if, considering only the probative evidence and reasonable inferences supporting the verdict, without weighing evidence or assessing witness credibility, a reasonable trier of fact could conclude that the defendant was guilty beyond a reasonable doubt. *Kindred v. State* (1988), Ind., 524 N.E.2d 279.

The evidence favorable to the trial court's judgment establishes that the victim, Clinton Page; the State's chief witness, Gary Glenn; and Jaske were all inmates at the Indiana Reformatory at the time of the incidents involved in this appeal. Prior to the incidents in question, Jaske had twice initiated Glenn (once in 1982 and again in 1983) into an organization to which Jaske belonged. The second initiation was necessitated because Jaske had lost the results of the first initiation. The initiation ritual involved three parts and was conducted after Jaske tied the initiate's hands and feet to a tree or piece of lumber and covered the initiate's eyes with a scarf or piece of cloth. In part one, Jaske would strike the initiate in the stomach once with his fist, hard enough to knock the breath out of the initiate, and then time how long it took the initiate to regain his breath. In part two, Jaske would again strike the initiate with his fists in the stomach, but this time would continue striking him until the initiate passed out. Jaske would then time how long it took the initiate to regain consciousness. Once the initiate passed the third part of the initiation, he was a member of the organization. Jaske referred to the organization as the "syndicate" and offered initiates opportunities for cash, jobs, and an early release from prison. Glenn also testified to Jaske's prior admission to Glenn that Jaske had given the three-part initiation to another inmate, Bill Gick, who

1. *See Jaske v. State* (1978), 269 Ind. 196, 379 N.E.2d 451 (affirming first-degree murder conviction and life sentence imposed thereon); *Jaske v. State* (1986), Ind., 495 N.E.2d 169 (affirming trial court's denial of defendant's post-conviction petition for relief).

almost "didn't make it," and to whom Jaske was forced to give mouth-to-mouth resuscitation "to bring him back."

Glenn testified that Page agreed to be initiated by the defendant in late 1983 after having the initiation ceremony explained to him. Some time after the noon hour on December 12, 1983, Page, Glenn, and Jaske stole away to a relatively unfrequented area of the Reformatory known as the dry kiln, an area where lumber was stored. There, while Glenn acted as lookout, Jaske tied Page by his hands and feet to some lumber, covered Page's eyes with a scarf, and then administered the first of the tests, striking Page in the stomach with his fist. Jaske then began to administer the second part of the initiation. After about the ninth blow, Glenn thought Jaske was hitting Page too hard. Glenn yelled at Jaske, but Jaske told Glenn to "mind his own business," and "that [Jaske] knew what he was doing." Glenn testified that after about three more blows, the beating stopped. When Glenn walked back to Jaske, he was giving Page mouth-to-mouth resuscitation in an effort to revive him. Jaske rejected Glenn's pleas to seek medical attention for Page. Jaske's resuscitation efforts eventually proved unsuccessful, and Jaske and Glenn decided to bury Page's body between several large stacks of lumber located in the dry kiln area. Medical testimony revealed that the cause of death was a blunt force injury to the abdomen with tearing of the major vessels and hemorrhaging. The testimony also revealed binding abrasions on his wrists.

Another witness, Steven Seeley, testified that Jaske admitted getting "carried away" and killing Page by beating him in the stomach during an "initiation into a club or something" after having first tied up the victim's feet and hands.

■ The defendant's argument that insufficient evidence exists to support his conviction for battery rests upon the contention that Page's initial consent to participate in the initiation acts as a complete defense. The defendant further argues that the victim's consent acts as a defense to the defendant's battery conviction; that the involuntary manslaughter conviction must also fall because, under the defendant's reading of Indiana's involuntary manslaughter statute,[2] the only potentially applicable provision is Ind.Code § 35–42–1–4(3); and that if a defense exists to the battery conviction, the defendant cannot properly be convicted of involuntary manslaughter.

We first note that lack of consent is not included among the statutory elements of the offense of battery. Ind.Code § 35–42–2–1. Furthermore, because Ind. Code § 35–38–1–7(c)(3) expressly recognizes a victim's inducement or facilitation of the offense as a mitigating circumstance in sentencing, it is clear that our legislature does not intend a victim's consent to operate as a bar to conviction.

The defendant cites several cases from other jurisdictions, all with sexual overtones, and only one Indiana case, *Vanvactor v. State* (1888), 113 Ind. 276, 15 N.E. 341, in support of his argument. In *Vanvactor*, this Court reversed a teacher's assault and battery conviction for disciplining a student, concluding that under the circumstances of that case, insufficient evidence existed to support the conviction. Although noting that the student accepted the punishment as an alternative to leaving school, the decision in *Vanvactor* was not based on the student's "consent." Rather, it concluded that "a teacher may exact a compliance with all reasonable commands, and may, in a kind and reasonable spirit, inflict corporal punishment upon a pupil for disobedience." 113 Ind. at 280, 15 N.E. at 342. *See also* Stroud, *The Teacher Privilege to Use Corporal Punishment,* 11 Ind.

---

**2.** Ind.Code § 35–42–1–4 provides:
 A person who kills another human being while committing or attempting to commit:
 (1) A class C felony or class D felony that inherently poses a risk of serious bodily injury;
 (2) A class A misdemeanor that inherently poses a risk of serious bodily injury; or

(3) Battery;
commits involuntary manslaughter, a class C felony. However, if the killing results from the operation of a vehicle, the offense is a class D felony.

L.Rev. 349, 351 (1978) (policy of the teacher's privilege is to permit such intrusions by a teacher that are reasonably necessary for the proper education and discipline of the student). Such a rationale has no application to the beating to death of one prison inmate by another.

We find pursuasive the reasoning in *State v. Fransua* (1973), N.M.Ct.App., 85 N.M. 173, 510 P.2d 106, in which the defendant and his victim were drinking together in a bar when they engaged in an argument, during the course of which the defendant stated that if he had a gun, he would shoot the victim. In response to the defendant's statement, the victim went out to his automobile to retrieve a loaded pistol, walked back into the bar, laid the pistol on the bar, and told the defendant to shoot him if he wanted to. The defendant picked up the pistol and shot the victim in the head, was subsequently convicted of aggravated battery, and on appeal raised as a defense the victim's consent to the aggravated battery. The New Mexico Court of Appeals rejected the defendant's argument, reasoning as follows:

> It is generally conceded that a state enacts criminal statutes making certain violent acts crimes for at least two reasons: One reason is to protect the persons of its citizens; the second, however, is to prevent a breach of the public peace. [citations omitted] While we entertain little sympathy for either the victim's absurd actions or the defendant's equally unjustified act of pulling the trigger, we will not permit the defense of consent to be raised in such cases. Whether or not the victims of crimes have so little regard for their own safety as to request injury, the public has a stronger and overriding interest in preventing and prohibiting acts such as these. We hold that consent is not a defense to the crime of aggravated battery ... irrespective of whether the victim invites the act and consents to the battery.

85 N.M. at 174, 510 P.2d at 107. *See also Lyons v. State* (1983), Fla.Dist.Ct.App., 437 So.2d 711 (expressly adopting New Mexico Court of Appeals view); Annotation, *Consent as Defense to Charge of Criminal Assault and Battery*, 58 A.L.R.3d 662 (1974) (noting the general view that in assault cases without sexual overtones, consent is ordinarily not a defense).

▉ Because we hold consent is not a defense to the charge of battery, we need not address the defendant's attack upon his involuntary manslaughter conviction. Sufficient evidence exists to affirm the defendant's convictions for involuntary manslaughter and battery.

### 2. Double Jeopardy

▉ Although not argued by the defendant in his brief, the State points to a double jeopardy problem in affirming the defendant's convictions and sentences for both involuntary manslaughter and battery, and argues that should this Court raise the issue *sua sponte*, we should affirm the defendant's involuntary manslaughter conviction. The rule for purposes of double jeopardy analysis is that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not." *Elmore v. State* (1978), 269 Ind. 532, 534, 382 N.E.2d 893, 895 (quoting *Blockburger v. United States* (1932), 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309). However, a double jeopardy analysis is not necessarily limited to an evaluation of the statutory provisions. The factual bases alleged by the State in the information or indictment and upon which the charges are predicated must also be examined. *Hall v. State* (1986), Ind., 493 N.E.2d 433. An examination of the statutes and the informations reveals that the two crimes at issue in this case do not each require proof of an additional fact which the other does not.

▉ In this case, the involuntary manslaughter charge and the battery charge were both based upon the defendant's actions of repeatedly hitting the victim in the stomach. The information for involuntary manslaughter alleged: "On or about the

12th day of December, 1983, ... ROGER ALLEN JASKE, did kill Clinton B. Page, while committing Battery, a Class C Felony, that inherently posed a risk of serious bodily injury by repeatedly hitting Clinton B. Page in the stomach." The information for battery alleged: "On or about the 12th day of December, 1983, ... ROGER ALLEN JASKE, did knowingly touch Clinton B. Page, in a rude, insolent, and angry manner, to-wit: By repeatedly hitting Clinton B. Page in the stomach, which hitting resulted in serious bodily injury to Clinton B. Page."

Once the State proved its involuntary manslaughter case, its battery case was proven as well. The battery charge in this case required proof of no more facts than the involuntary manslaughter charge. Thus, to convict and sentence the defendant upon both of these charges violates the double jeopardy prohibition. *Cf. Woodrum v. State* (1986), Ind.App., 498 N.E.2d 1318. Notwithstanding our conclusion that sufficient evidence exists to affirm the defendant's convictions upon both counts, this case must be remanded to the trial court with instructions to vacate the defendant's conviction and sentence for battery.

### 3. Testimony of Terry Horn

The defendant raises two arguments concerning the testimony of witness Terry Horn. First, he claims the trial court abused its discretion in granting his trial counsel only a thirty-minute recess to interview Horn, whose name never appeared on a formal pretrial witness list and whom the defendant claims was a surprise witness. Second, the defendant claims the admission of Horn's testimony concerning an alleged 1974 beating administered to Horn by

Jaske denied the defendant a fair trial in that the evidence did not properly establish common scheme or plan, but merely showed "that the defendant was a generally bad person with a propensity for assault."

When the State called Horn to testify, the defendant objected, and a hearing was held outside the presence of the jury. Observing that the State had never submitted a list of witnesses in response to the defendant's pretrial motion for discovery requesting "[t]he names and addresses of all witnesses which the State intends to call at the time of trial, together with their relevant written or recorded statements," the defendant's counsel requested that the trial court either refuse to allow Horn to testify or grant a continuance of sufficient length to allow counsel an opportunity to investigate and interview persons in an attempt to rebut Horn's "surprise" testimony. The record reveals that prior to trial, the defendant's counsel was furnished both a copy of Horn's statement dated April 24, 1975, and a copy of the subpoena issued to Horn approximately two weeks before trial. However, the record does not reveal why the State failed to file a list of witnesses as requested by the defendant.[3] The trial court granted a recess of thirty minutes in order to allow the defendant's counsel to interview Horn prior to his testimony and suggested the defendant's counsel could locate rebuttal witnesses during the evening hours following completion of the day's testimony.[4]

A trial judge has the responsibility to direct the trial in a manner which facilitates the ascertainment of truth, ensures fairness, and obtains economy of time and effort commensurate with the

---

**3.** The following colloquy occurred during the hearing outside the presence of the jury:

Judge: Did you ever submit a list of witnesses, Mr. Alexander [prosecutor for the State]?

Prosecutor: I don't believe so, Your Honor.

Judge: What's your position on this, you didn't submit a list of witnesses?

Prosecutor: We just simply gave her copies of everything we had in our file.

Judge: Okay, well, I'm going to deny the motion Mrs. Clark [defendant's trial counsel]. Go ahead.

Defendant's counsel admitted receiving a large amount of discovery materials from the prosecutor's office, including "basically [defendant's] entire [1975] trial from up north."

**4.** This undoubtedly would not have proven a simple task as the trial was held in Madison County, and the witnesses and records surrounding the alleged incident involving Terry Horn, occurring nearly ten years prior to the trial at issue, were located in LaPorte County.

rights of both society and the criminal defendant. *Allen v. State* (1982), Ind., 439 N.E.2d 615; *Reid v. State* (1978), 267 Ind. 555, 372 N.E.2d 1149; *State ex rel. Keller v. Criminal Court of Marion County* (1974), 262 Ind. 420, 317 N.E.2d 433. Where there has been a failure to comply with discovery procedures, the trial judge is usually in the best position to determine the dictates of fundamental fairness and whether any resulting harm can be eliminated or satisfactorily alleviated. *Reid,* 267 Ind. 555, 372 N.E.2d 1149. Where remedial measures are warranted, a continuance is usually the proper remedy, but exclusion of evidence may be appropriate where the discovery non-compliance has been flagrant and deliberate, or so misleading or in such bad faith as to impair the right of fair trial. *Wagner v. State* (1985), Ind., 474 N.E.2d 476; *Crenshaw v. State* (1982), Ind., 439 N.E.2d 620. Moreover, "[t]his Court takes a dim view of the State's use of witnesses not disclosed in response to a proper discovery request, and without seeking leave of court or providing a reasonable explanation for this failure." *Mers v. State* (1986), Ind., 496 N.E.2d 75, 83. The trial court must be given wide discretionary latitude in discovery matters since it has the duty to promote the discovery of truth and to guide and control the proceedings, and will be granted deference in assessing what constitutes substantial compliance with discovery orders. *Allen,* 439 N.E.2d 615; *Harris v. State* (1981), Ind., 425 N.E.2d 112. Absent clear error and resulting prejudice, the trial court's determinations as to violations and sanctions should not be overturned. *Wagner,* 474 N.E.2d 476; *Murray v. State* (1982), Ind., 442 N.E.2d 1012.

Citing *Johnson v. State* (1971), 255 Ind. 589, 266 N.E.2d 57, for the proposition that a defendant is generally entitled to a complete list of the names and addresses of the State's witnesses, the defendant relies upon *Johnson v. State* (1979), 179 Ind.App. 28, 384 N.E.2d 1035, for his argument that the thirty-minute recess constituted an abuse of discretion by the trial court. Our Court of Appeals in *Johnson* found the trial court's grant of a mid-trial opportunity to depose a surprise expert witness the night before the expert's testimony was given comparable in effect to a pretrial denial of a motion to depose an opposing party's expert witness. In addition, the court found that the defendant was effectively precluded from obtaining an expert witness for rebuttal purposes or to investigate and prepare for the technical evidence. We fail to find the reasoning of *Johnson* persuasive in this case.

While we strongly disapprove of the State's failure to file a list of witnesses in response to the defendant's proper discovery request, we perceive no intentional obfuscation or bad faith on the part of the State. Moreover, the defendant was furnished a copy of Horn's 1975 statement prior to trial and also was aware that Horn was issued a subpoena approximately two weeks prior to trial. Thus, Horn cannot be correctly characterized as a surprise witness. The defendant's trial counsel thoroughly cross-examined Horn at trial and effectively argued to the trial court the difficulties in admitting Horn's testimony under the common scheme or plan exception to the general rule prohibiting evidence of other crimes. In addition, the record reveals no unsuccessful attempts by the defendant's counsel to acquire records or contact persons from LaPorte County in an effort to later rebut Horn's testimony, as invited by the trial court. While we do not necessarily agree with the trial judge's decision, we do not conclude that by granting only a thirty-minute recess to interview Horn, the trial court committed abuse of discretion requiring reversal. *Cf. Robinson v. State* (1983), Ind., 450 N.E.2d 51.

Horn testified that he met Jaske around 1974 and that Jaske offered Horn an opportunity to work with him in the auto body business upon the completion of a required initiation into a club of the defendant's. Agreeing to participate in the initiation, Horn testified that he, Jaske, and one Carl Colmes traveled out to the "country," where Jaske tied Horn's hands and feet to a tree and then beat Horn in the stomach with his fists until he (Horn) passed out. Jaske did not offer Horn any details con-

cerning the initiation until he actually began striking Horn in the stomach, at which point Horn asked Jaske how many times he would be struck and Jaske replied until Horn passed out. Jaske then beat Horn in the stomach with his fists until Horn passed out. After the beating Horn sought medical attention, resulting in the surgical removal of his left kidney. Horn also testified that he never truthfully told anyone at that time how he was injured; instead, Horn told hospital personnel he was injured by falling out of a tree while "coon" hunting.

While generally evidence of uncharged crimes is inadmissible to prove the guilt of the accused, *Staton v. State* (1988), Ind., 524 N.E.2d 6, our cases have recognized exceptions to this general rule where the identity of the perpetrator is at issue, including evidence of uncharged crimes to show "a motive for the charged crime, a plan or scheme to commit the crime, the defendant's preparation for the crime, his guilty knowledge of the crime, or that he was a member of a conspiracy to commit the crime." *Penley v. State* (1987), Ind., 506 N.E.2d 806, 808. The second aspect of the defendant's argument concerning the testimony of Terry Horn raises the question of the propriety of the admission of the evidence under the common scheme or plan exception.

In *Penley,* we noted that "our cases recognize two branches of the 'common scheme or plan' exception, the first permitting proof of identity by showing the defendant committed other crimes with identical *modus operandi,* and the second permitting proof of an uncharged crime as evidence of a preconceived plan which included the charged crime." *Id.* at 809. *Penley* established the following test for the admission of crimes with identical *modus operandi:*

The State may prove identity by showing that the similarities between the two crimes are so strong and the method so clearly unique that it is highly probable that the perpetrator of both is the same person. ... We require a strong showing that the different criminal actions were so similarly conducted that the method of conduct can be considered akin to the accused's signature. ... The acts or methods employed must be so similar, unusual and distinctive as to earmark them as the acts of the accused.

*Id. Penley* also added the following caution:

Mere repetition of similar crimes does not by itself warrant admission of the evidence of those crimes under the *modus operandi* rule. In order for the *modus operandi* rule to serve its intended purpose, the inquiry must be, "Are these crimes so strikingly similar that one can say with reasonable certainty that one and the same person committed them?" Not only must the methodology of the two crimes be strikingly similar, but the method must be unique in ways which attribute the crimes to one person.

*Id.* at 810.

In the present case, the defendant's identity as the perpetrator of the charged offense was clearly at issue. Throughout trial, the defendant's counsel suggested that Glenn rather than Jaske was the person responsible for beating Page to death. Glenn had previously given a statement to prison officials that he rather than Jaske was the person who had beaten Page. In addition, the defendant testified that he did not beat the victim, did not beat Glenn, did not beat Horn, and belonged to no club or organization similar to that discussed previously.

Thus, we are left to determine whether "these crimes [are] so strikingly similar that one can say with reasonable certainty that one and the same person committed them?" The circumstances of the charged offense were similar to those described by Horn in the following ways: In both cases, the beatings to the initiates' stomachs arose from the defendant's insistence on initiating the initiates into the defendant's organization; following the initiations, the initiates were to be members of the organization; the initiates at first voluntarily consented to the mandatory initiation; the initiates agreed to join the defendant's organization to receive the accompanying re-

wards offered by the defendant; the initiates were tied by their hands and feet to either a tree or a piece of lumber for purposes of the initiation; the initiates were struck by the defendant in the stomach with the defendant's fists until the initiates passed out; and the initiates sustained serious abdominal injuries causing loss of life or vital organs as a result of the blows administered by the defendant during the initiation. We hold that notwithstanding the differences between Horn's testimony and the instant offense pointed out by the defendant's able trial counsel and in his appellate brief, the "strikingly similar" standard of *Penley* is satisfied in this case and that the trial court properly permitted the State to introduce Horn's testimony for purposes of establishing the defendant's identity through the *modus operandi* branch of the common scheme or plan exception to the general prohibition against the admission of evidence of uncharged criminal acts.

### 4. Admissibility of Evidence Concerning Beating of Jeffrey Harmon

The defendant's next issue again raises two separate arguments. First, he argues that the trial court improperly permitted the State to cross-examine him concerning the details of his prior murder conviction, specifically, whether or not the victim of the prior murder, Jeffrey Harmon, was beaten. Second, the defendant argues that the trial court erred in allowing the testimony of Joon S. Kim, M.D., in response to the defendant's denial that Jeffrey Harmon had been beaten.

Early in its cross-examination of the defendant, the State elicited the admission that he had previously been convicted of first-degree murder and was presently serving a life sentence for that conviction. Such questioning was clearly permissible. *Ashton v. Anderson* (1972), 258 Ind. 51, 279 N.E.2d 210. Later in the cross-examination, the following colloquy occurred:

> Prosecutor: In your murder conviction was the guy beaten to death?

> Defense Counsel: At this time, Your Honor, I would request a mistrial. Mr. Alexander [the Prosecutor] clearly knows that all he can ask this client is what his conviction was for. He can't go into anything concerning the facts surrounding that conviction.

> Judge: Objection overruled. Motion for mistrial denied.

> Prosecutor: Was he beaten to death?

> Defendant: No, he was not.

> Prosecutor: Was he beaten?

> Defendant: No.

> Defense Counsel: Show my continuing objection to this, Your Honor.

> Judge: Your answer was no?

> Defendant: That's right.

> Judge: Move on to something else.

> Defendant: If you will care to get the autopsy he was stabbed to death.

> Judge: Just a minute, just a minute, no question. Now you're going to get yourself in a mess if you start volunteering stuff. (R.909)

The defendant contends the above cross-examination was improper and prejudicial even though he denied that a beating had been involved because his denials served to form the basis for the introduction of the rebuttal evidence of Dr. Kim. We agree that had the State's questioning of the defendant concerning the details of his prior conviction been solely for purposes of impeachment, the questioning would have been improper. *Baker v. State* (1987), Ind., 505 N.E.2d 49; *Hansford v. State* (1986), Ind., 490 N.E.2d 1083. However, the improper admission of evidence is harmless error when the conviction is supported by such substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction. *Hodges v. State* (1988), Ind., 524 N.E.2d 774; *Maiden v. State* (1985), Ind., 477 N.E.2d 275. In this case, notwithstanding the defendant's denial that he beat Harmon, we find such substantial independent evidence to support the defendant's guilt. Aside from Gary Glenn's eyewitness testimony to the defendant's fatally beating the victim, the defen-

dant confessed to Steven Seeley that he (the defendant) had killed the victim during an initiation into a club. Also probative of the defendant's identity as the perpetrator of this offense, and thus his guilt, is the common scheme or plan testimony of Glenn and Horn concerning prior similar beatings administered to them by the defendant. We find no substantial likelihood that the testimony as impeachment evidence contributed to the convictions. Had the evidence been improperly admitted solely for purposes of impeaching the defendant, the error nevertheless was harmless.

 Independent from our harmless error analysis, we also conclude that the general prohibition upon impeachment concerning the details of prior convictions is inapplicable here because the evidence was properly admissible as substantive evidence under the common scheme or plan exception.

 Following the defendant's denial during cross-examination that Harmon had been beaten, Dr. Kim testified that in 1975, he performed an autopsy on one Jeffrey Harmon at the request of the LaPorte County Coroner's office and testified to the results of that autopsy at defendant's 1976 trial for the murder of Jeffrey Harmon. Dr. Kim testified that the autopsy revealed a sixteen-year-old boy, five feet four inches in height, weighing approximately 120 pounds, with nineteen stab wounds in his chest and abdomen, bruise marks in the shoulder and back around the area where the spleen is located, and visible markings on the hands and ankles indicating Harmon had been tied up before he had been killed. Dr. Kim testified Harmon's spleen had ruptured due to trauma consistent with the administration of either a kick or a forceful blow approximately thirty minutes prior to the stabbings.[5]

By questioning the defendant concerning whether Harmon had been beaten, the State was merely seeking substantive evidence concerning common scheme or plan.

The evidence concerning the beating death of Harmon provided a basis to find both a "strikingly similar" *modus operandi* and a preconceived criminal plan or design by the defendant to tie persons up by the hands and feet and beat them. Under *Penley*, a basis can be found upon which to conclude that the trial court did not err in permitting the State to question the defendant concerning the details of his prior conviction.

Nor do we find error by the trial court in allowing Dr. Kim to testify. On redirect examination, following the defendant's denial that Harmon had been beaten, the defendant's attorney introduced into evidence Defendant's Exhibit L, a copy of the indictment from the defendant's 1976 murder trial, which charged that the defendant "did ... kill and murder one Jeffrey Allen Harmon by ... stabbing the said Jeffrey Allen Harmon about the body with a knife[.]" Following this action by the defendant, the State properly called Dr. Kim to testify.

Recognizing that admission of evidence out of order is within the sound discretion of the trial court and will be reversed only upon a showing of abuse of discretion, *City of Fort Wayne v. Bishop* (1950), 228 Ind. 304, 92 N.E.2d 544; *State Farm Mut. Auto. Ins. Co. v. Shuman* (1977), 175 Ind. App. 186, 370 N.E.2d 941, the defendant contends that the testimony of Dr. Kim was improperly admitted for the reason that his testimony should have correctly been introduced during the State's case-in-chief, and the State's failure to do so, combined with the trial court's admission of the evidence in rebuttal, constitutes an abuse of discretion by the trial court. The defendant also claims the evidence that Harmon had been bound and beaten prior to his death has little probative value. With defendant's latter contention we disagree. While the evidence that Harmon had been tied up and beaten before he died could have been introduced by the State during its case-in-chief, the evidence need not have

---

5. Although not argued at trial, nor a part of our analysis in this case, we note that at defendant's 1976 murder trial, defendant's own expert, a Dr. William H. Mott, testified that in his opinion, the victim died as the result of a ruptured spleen. *Jaske,* 269 Ind. at 201, 379 N.E.2d at 453.

necessarily been introduced at that point. The State may not have planned to use Dr. Kim's testimony unless the defendant denied that Harmon had been beaten. In the event the defendant had answered the prosecutor's question truthfully, the State may have decided Dr. Kim's testimony was unnecessary. We decline to find reversible error on this issue.

### 5. *Habitual Offender Determination*

Among his several contentions challenging the habitual offender determination, the defendant argues that it is not supported by sufficient evidence. We must agree.

The State furnished proof that the defendant was convicted of theft as a felony on June 12, 1972, and of first-degree murder on January 7, 1977. However, the record fails to contain any evidence establishing by direct proof or reasonable inference the date on which the murder was committed. The evidence does not eliminate the possibility that the murder occurred before the defendant was sentenced on the theft conviction. Failure of proof that a second predicate offense was committed subsequent to the date of sentencing for the first predicate offense will require that a habitual offender determination be vacated. *Smith v. State* (1987), Ind., 514 N.E.2d 1254; *Steelman v. State* (1985), Ind., 486 N.E.2d 523; *Clark v. State* (1985), Ind., 480 N.E.2d 555.

### CONCLUSION

The defendant's conviction for involuntary manslaughter is affirmed. This cause is remanded to the trial court with instructions to vacate the defendant's conviction and sentence for battery, to vacate the habitual offender determination, and to enter a corrected sentence on the involuntary manslaughter conviction.

SHEPARD, C.J., and DeBRULER, GIVAN and PIVARNIK, JJ., concur.