Morgan K. GOVAN, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 02A03–0902–CR–55.

Court of Appeals of Indiana.

Sept. 9, 2009.

Transfer Denied Nov. 17, 2009.

John C. Bohdan, Fort Wayne, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Scott L. Barnhart, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Morgan K. Govan appeals his convictions for Class C felony battery and Class A misdemeanor battery for branding his long-term girlfriend with a hot knife and hitting her with a cord. Specifically, he contends that the evidence is insufficient to support his convictions because the charges arose out of sadomasochistic sexual practices to which his girlfriend consented. In Indiana, consent is not a defense to battery in most circumstances. Because the activities in this case involved a deadly weapon, consent is not available as a defense. Furthermore, because Govan admitted to beating his girlfriend with a belt-like object because she had been with another man and lied about it, and his girlfriend locked herself inside a closet, where she tried to kill herself; escaped to her place of employment, where she locked herself inside the building and called 911; told the 911 dispatcher that she wanted to press charges against Govan; told the police that Govan had branded her with a hot knife and struck her with an extension cord (but, notably, did not mention consent); and testified at trial that she did not want to be there and she still had feelings for Govan, the jury was free to conclude that the victim did not consent to battery. We therefore affirm Govan's convictions for battery.

### Facts and Procedural History

In 2008, Govan and A.H. were involved in an on-again, off-again relationship that spanned thirteen years. They had an open relationship, which meant that they could "associate with other [people] and still be together." Tr. p. 140. A.H. lived in an apartment in Allen County. Govan lived with his mother but stayed most nights with A.H. and kept some of his belongings there.

When A.H. arrived at her apartment in the early morning hours of September 11, 2008, Govan asked her if she had cheated on him. A.H., who had in fact cheated on him, said no. However, Govan, sensing otherwise, became angry because A.H. had lied to him. According to A.H.'s trial testimony, she realized that she had emotionally hurt Govan and decided that "[she] wanted him to hurt [her]." Id. at 93. So, A.H. instructed Govan to tie her up. Govan had recently undergone shoulder surgery and had limited mobility with his dominant hand because that arm was in a brace and wrapped to his torso. As such, A.H. and Govan, as a team, ripped bed sheets into strips. Govan then instructed A.H., who was now naked, how to tie the strips around her wrists. Govan then tied A.H.'s wrists and ankles together. At this point, A.H. was "hog tied" on the floor. Id. at 96.

After a period of time, Govan untied A.H., and she moved to the bed, where she was then tied to the bed frame. Govan then started poking her with a knife that

he had heated with a lighter. According to A.H.'s trial testimony, this "hurt." *Id.* Govan did this "[b]ecause he wanted to hurt [her]." *Id.* Govan then tried to "brand" A.H. with his initials. *Id.* at 97; Ex. 5, 10. The State asked A.H. on direct examination if she agreed that Govan could brand her, and the following exchange occurred:

> Q And when it came to the knife, was this something that you had agreed that [he] could brand his initials on your butt with a knife?
>
> A I told him to hurt me, because I know I realized I hurt him.
>
> Q Did that include the knife though?
>
> A Yes.
>
> Q And did it get to the point where, did it ever get to the point with the knife that you no longer wanted him to do it?
>
> A Yes. I told him to stop.
>
> Q And did he stop when you told him to stop?
>
> A Yes.
>
> Q While the act was occurring, what did you do because of the pain?
>
> A I just put my head down in the pillow.

Tr. p. 98. However, it was pointed out on cross-examination that A.H. gave a slightly different version of the branding incident in her pre-trial deposition. Specifically, when she was asked during her deposition whether the knife was applied to her skin with her consent, A.H. replied, "[T]o an extent, [though Govan] took it a little too far." *Id.* at 156. A.H. then explained that what she meant by that response was that she "didn't realize what he was going to do was ... brand me with a hot knife," though she knew something painful in general was going to occur. *Id.* at 157.

A.H. was tied to the bed for approximately ten or fifteen minutes, and during this period of time, her hands went numb. When she relayed this to Govan, he re-leased her. Though the timing is unclear, Govan also hit A.H. on her back with an extension cord, which left a mark. Ex. 5. According to A.H., she and Govan had sex at some point on September 11. *See* Tr. p. 109 ("Q [A.H.], did you and Mr. Govan have sex on September 11th? A Yes."). A.H. explained that these activities were a "turn on" to her. *Id.* at 153.

In any event, after being released from the bed, A.H. went into the closet "on [her][own] free will" and locked the door from the inside. *Id.* at 146. After A.H. went inside the closet, Govan pushed a couch in front of the door. A.H. tried to hang herself in the closet, but the clothing rod was too low. Eventually, A.H. went to sleep because she was exhausted. *Id.* at 101. After a couple of hours, A.H. emerged from the closet to use the restroom. In an attempt to get away from Govan, she told him that she needed to go to work to pick up her paycheck, though payday was the following day. Govan accompanied her but stayed in the car. Once A.H. was inside her place of employment, she locked the door. Her co-worker, Myra Neireiter, described A.H. as "shaken, very nervous, and distraught." *Id.* at 173. A.H. told Neireiter that Govan had "whipped her and tied her up." *Id.* at 174. A.H. lifted up her shirt to reveal her injuries. A.H. then called 911. According to the 911 call, which was played for the jury during trial, she told the dispatcher that she and Govan had been getting into it over the past two days, Govan had beat her with a cord, she wanted the police to pick him up, and she wanted to press charges. She told the dispatcher that she was not going outside the building to talk to the police until Govan was detained. When the police arrived at A.H.'s work, she told them that Govan had branded her with a hot knife and struck her with an extension cord. *Id.* at 113. She, however,

did *not* tell the police that she had asked Govan to do these things to her because she felt that she deserved it for lying to him about cheating on him. *Id.* at 159. The police later went to A.H.'s apartment to collect evidence and take pictures of her.

The following day, the police videotaped an interview with Govan. During the interview, Govan said that on September 11, 2008, A.H. came home and, after first lying about being with another man, admitted to being with another man. Govan said he became upset because A.H. had lied to him. He explained that what followed was not heated, but he probably took it too far. Govan said he had A.H. tie sheets to a bed and was yelling at her and instructing her how to do things. Ex. 17 (25:42). He also admitted to hitting A.H. with a belt-like object on her back, *id.* (25:57, 29:22, 29:34), "beat[ing]" her, *id.* (28:54), and making her go into a closet for fifteen or twenty minutes, *id.* (44:08). He said he went on a "rampage," which scared the "shi\* out of [A.H.]." *Id.* (30:08). This all came about, he explained, because he saw marks on A.H., and if another man was going to beat on A.H., he was going to do so, too. On multiple occasions in the interview, Govan denied having sex with A.H. on September 11, 2008. *Id.* (29:41, 32:46, 43:23). Near the end of the interview, when Govan expressed uncertainty about A.H.'s allegations against him,[1] he said to the detectives, "Now she's saying battery [for the belt], okay, I'm guilty for that." *Id.* (48:11). But he quickly said it was not like that, because they typically do kinky things like that during sex. Govan also said they often role-play during sex.

The State charged Govan with Class B felony criminal confinement, Class C felony battery (deadly weapon: knife),[2] and Class A misdemeanor battery (bodily injury: physical pain and/or visible injury).[3] The State later added a count alleging that Govan was a habitual offender. A jury trial was held in November 2008. As noted above, A.H. testified at trial, and Govan's videotaped interview, Ex. 17, and A.H.'s 911 call, Ex. 14, were admitted into evidence. A.H. testified that she did not want to be there and she still had feelings for Govan. Tr. p. 109. At the close of the evidence, the defense moved for judgment on the evidence for the criminal confinement charge, which the trial court granted. During closing arguments, the State argued that consent is not a defense to battery[4] and specifically argued, "[I]t is not a defense to battery that someone cheats on you." *Id.* at 205, 207. The State reasoned that Govan battered A.H. because he was mad that she had lied to him and that if another man had beat her, he was going to do so, too. *See id.* at 210 ("Feeling guilty for cheating does not equal consent to being hog tied, beaten and branded. His anger at her betrayal is why we're here."). The jury found Govan guilty of both counts of battery and also found him to be a habitual offender. The trial court sentenced Govan to four years for the Class C felony battery and one year for the Class A misdemeanor battery, to be served concurrently, and enhanced the sentence by

---

1. At the beginning of the interview, the detectives would not tell Govan what A.H.'s allegations against him were and instead instructed Govan to tell them what had happened between the two of them over the past couple of days.

2. Ind.Code § 35–42–2–1.

3. *Id.*

4. The jury instructions are not included in the record on appeal, *see* Tr. p. 79, 204; therefore, we do not know if an instruction on this topic was given to the jury. In any event, there is no instructional error alleged on appeal.

four years for the habitual offender adjudication. Govan now appeals.

## Discussion and Decision

■ Govan contends that the evidence is insufficient to support his convictions for battery because the charges arose out of sadomasochistic sexual practices to which the victim consented. When reviewing the sufficiency of the evidence, appellate courts must only consider the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind.2007). It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient. *Id.* To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it "most favorably to the trial court's ruling." *Id.* Appellate courts affirm the conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id.* at 146–47 (quotation omitted). It is therefore not necessary that the evidence "overcome every reasonable hypothesis of innocence." *Id.* at 147 (quotation omitted). "[T]he evidence is sufficient if an inference may reasonably be drawn from it to support the verdict." *Id.* (quotation omitted).

The Indiana Supreme Court held in *Jaske v. State*, which is a case involving the beating to death of one prison inmate by another during a prison initiation, that consent is not a defense to battery. 539 N.E.2d 14, 18 (Ind.1989). In reaching this holding, our Supreme Court adopted the following reasoning by the New Mexico Court of Appeals:

It is generally conceded that a state enacts criminal statutes making certain violent acts crimes for at least two reasons: One reason is to protect the persons of its citizens; the second, however, is to prevent a breach of the public peace, [citations omitted] While we entertain little sympathy for either the victim's absurd actions [in producing a gun and inviting the defendant to shoot him] or the defendant's equally unjustified act of pulling the trigger, we will not permit the defense of consent to be raised in such cases. Whether or not the victims of crimes have so little regard for their own safety as to request injury, the public has a stronger and overriding interest in preventing and prohibiting acts such as these. We hold that consent is not a defense to the crime of aggravated battery ... irrespective of whether the victim invites the act and consents to the battery.

*Id.* (quoting *New Mexico v. Fransua*, 85 N.M. 173, 510 P.2d 106, 107 (1973)).

For good reason, the State of Indiana has enacted criminal statutes both to protect its citizens and to prevent a breach of the public peace. As such, our legislature has not listed lack of consent as a statutory element to battery (and to other crimes for that matter). *See id.* at 17. Accordingly, our Supreme Court held in *Jaske* that a victim's consent is not a defense to battery. And since *Jaske*, this holding has been applied to a charge of battery in the gang initiation context, where the defendant Helton delivered twenty bare-fisted, hard blows directly to the victim Hammons' head as part of a gang initiation ritual to which Hammons consented. *See Helton v. State*, 624 N.E.2d 499, 515 (Ind. Ct.App.1993), *trans. denied.*

On appeal, this Court noted that, although our Supreme Court in *Jaske* made the broad statement that "consent is not a defense to the charge of battery," *Jaske*, 539 N.E.2d at 18, it did not hold that consent could never be a defense to the charge of battery. *Helton*, 624 N.E.2d at 514. As such, we held as follows:

The rule in *Jaske* must be limited to its facts and the facts of the supporting cases cited therein. The *Jaske* rule that consent is no defense to the offense of battery is the exception, rather than the general rule. If our [S]upreme [C]ourt had held that defense could never be a defense to the charge of battery, it would have banned numerous legal activities, such as athletic contests, professions, and occupations involving invasions of one's physical integrity. Obviously, the *Jaske* court did not intend its holding to reach such conduct. *Id.* (footnote omitted). We therefore held that consent is not a defense to battery in the following circumstances: (1) where the defendant goes beyond acts consented to and beats to death the victim who consented only to the defendant's execution of the organization's initiation ritual of being struck in the stomach until he passed out (alluding to the facts of *Jaske* ); (2) where it is against public policy to permit the conduct or resulting harm even though it is consented to, as where there are no sexual overtones and the battery is a severe one which involves a breach of the public peace as well as an invasion of the victim's physical security; (3) where consent is ineffective, as where it is obtained by fraud or from one lacking legal capacity to consent; (4) where a deadly weapon is employed; (5) where death results; and (6) where the battery is atrocious or aggravated. *Helton,* 624 N.E.2d at 514 (citing *Jaske,* 539 N.E.2d at 17–18). We concluded that, although Hammons agreed to Helton's delivery of the blows to his head during the gang initiation ceremony, striking someone continuously in an area which is susceptible of injury as severe as permanent brain damage is an atrocious, aggravated battery for which consent is no defense. *Id.* at 515. We noted the general rule, however, that consent is ordinarily a defense to the charge of battery in cases involving sexual overtones.[5] *Id.* at 514 n. 22 (citations omitted).

Turning to the case at hand, it is undisputed that it involves sexual overtones. Notwithstanding those overtones, A.H.'s consent is not a defense to the crimes because Govan's actions involved a deadly weapon. We conclude that Govan's actions fall under the *Helton* category of use of a

**5.** To the extent that we noted that the general rule is that consent is ordinarily a defense to the charge of battery in cases involving sexual overtones, not all courts agree. For example, a New York appellate court held as follows:

> Indeed, while a meaningful distinction can be made between an ordinary violent beating and violence in which both parties voluntarily participate for their own sexual gratification, nevertheless, just as a person cannot consent to his or her own murder (*see, People v. Duffy,* 79 N.Y.2d 611, 584 N.Y.S.2d 739, 595 N.E.2d 814), as a matter of public policy, a person cannot avoid criminal responsibility for an assault that causes injury or carries a risk of serious harm, even if the victim asked for or consented to the act (*see, e.g., State v. Brown,* 154 N.J.Super. 511, 512, 381 A.2d 1231, 1232; *People v. Samuels,* 250 Cal.App.2d 501, 513–514, 58 Cal.Rptr. 439, 447, *cert denied* 390 U.S. 1024, 88 S.Ct. 1404, 20 L.Ed.2d 281; *Commonwealth v. Appleby,* 380 Mass. 296, 402 N.E.2d 1051; *State v. Collier,* 372 N.W.2d 303 [Iowa] ). And, although it may be possible to engage in criminal assaultive behavior that does not result in physical injury (*see,* Donnino, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law art 120, at 119), we need not address here whether consent to such conduct may constitute a defense, since the jury clearly found here that the complainant was physically injured. Defendant's claim that there is a constitutional right to engage in consensual sadomasochistic activity is, at the very least, too broad, since if such conduct were to result in serious injury, the consensual nature of the activity would not justify the result.

*New York v. Jovanovic,* 263 A.D.2d 182, 197 n. 5, 700 N.Y.S.2d 156 (1999) (formatting of cases as in original).

deadly weapon, namely, a knife, and therefore A.H.'s consent is not available as a defense to battery.

 We need not determine whether the actions fall under any of the other *Helton* categories because we conclude that the evidence most favorable to the verdicts reveals that the jury could have reasonably concluded that A.H. did not consent to be branded with the heated knife or beaten with the extension cord. That is, given that Govan admitted to beating A.H. with an extension cord because she had been with another man, and given that A.H. locked herself inside a closet, where she tried to kill herself; escaped to work, where she again locked herself inside; called 911 and reported to the dispatcher that she wanted to press charges against Govan; told police that Govan had branded her with a hot knife and struck her with an extension cord (yet failed to mention that she consented to these activities); and testified at trial that she did not want to be there and still had feelings for Govan, the jury was free to conclude that A.H. did not consent to be beaten with the extension cord, which was the basis of the Class A misdemeanor battery, and branded with the hot knife, which was the basis of the Class C felony battery. In such a highly charged domestic case as this, the jury is in the best position to make credibility determinations. We will neither reweigh evidence nor assess witness credibility.[6] We therefore affirm Govan's convictions for battery.

Affirmed.

NAJAM, J., and FRIEDLANDER, J., concur.

---

6. To the extent that Govan invokes the incredible dubiosity rule, we conclude that it does not apply. The "incredible dubiosity rule" provides that a court may "impinge on the jury's responsibility to judge the credibility of witnesses only when confronted with inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity." *Murray v. State*, 761 N.E.2d 406, 408 (Ind.2002). The application of this rule is limited to where a sole witness presents inherently contradictory testimony that is equivocal or the result of coercion and there is a complete lack of circumstantial evidence of the defendant's guilt. *James v. State*, 755 N.E.2d 226, 231 (Ind.Ct.App.2001),

*trans. denied.* "[A]pplication of this rule is rare and ... the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no person could believe it." *Stephenson v. State*, 742 N.E.2d 463, 497 (Ind.2001) (citation omitted). Here, not only do we have A.H.'s testimony, but Govan also admitted to beating A.H. with the cord in his videotaped statement. Therefore, there is not a sole witness. In addition, we have photographs of A.H.'s injuries, the knife itself, and testimony from A.H.'s coworker, showing A.H.'s state of mind shortly after she emerged from the closet. The rule simply does not apply.