[Crim. No. 5577. First Dist., Div. Two. Apr. 28, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. MARVIN S. SAMUELS, Defendant and Appellant.

502

Betty Aronow, Smith & Field, Evander C. Smith and Robert S. Field for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edward P. O'Brien and John T. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

SHOEMAKER, P. J.—Defendant Marvin Samuels was charged by indictment with two counts of conspiracy to violate Penal Code, section 311.2 (preparing and distributing obscene matter); two counts of assault by means of force likely to cause great bodily injury (Pen. Code, § 245); and a final count of sodomy (Pen. Code, § 286). Defendant pleaded not guilty to all charges.

The jury acquitted defendant of sodomy but found him guilty on both charges of conspiracy, one charge of aggravated assault and the offense of simple assault included in the other charge of aggravated assault. The simple assault conviction was subsequently dismissed. The court suspended the imposition of sentence, fined defendant $3,000 and placed him on probation for a period of 10 years.

Defendant appeals from the order granting probation and from an order 'denying his motion for new trial as to the conspiracy and aggravated assault charges. The latter order is nonappealable.

Defendant Samuels, an opthalmologist, testified that he recognized the symptoms of sadomasochism in himself, and his primary concern became to control and release his sadomasochistic urges in ways which were harmless. Through his hobby of photography, he participated in the production of several films on the east coast. Three of these films depicted bound individuals being whipped. Defendant wielded the whip in two of the films and acted as the cameraman, producer and director for the third film. He testified that the apparent force of the whippings was "faked" and that cosmetics were used to supply the marks of the apparent beating. Defendant produced one of these films at the trial.

In early September 1964, defendant met Kenneth Anger in San Francisco. Anger was a self-employed film director who had made such films as "Fireworks" and "Scorpio Rising." He had also been a close friend of Dr. Kinsey from the institute by that name, had been a buyer for the institute for a period of seven years, and had an authorization to send material through the mails.

On the night of their initial meeting, Anger introduced himself to defendant and inquired whether defendant had seen "Scorpio Rising." Defendant replied that he had not. Defendant had seen "Fireworks," however, and considered it the most sadomasochistic film he had ever seen. He told Anger that he himself had made two or three rolls of film dealing with sadomasochistic activity and was interested in having them developed. Anger volunteered to have the films developed and also told defendant that he believed that the Kinsey Institute would be very interested in examining the footage and might want the films for their collection, since they were then studying the subject of sadomasochism. Defendant agreed to mail the films to Anger's Hollywood address. There was no discussion of having the films developed at an ordinary camera store.

In the middle of September, defendant mailed the three rolls of film to Anger in Hollywood. Anger sent the rolls to a local film service laboratory, and picked up the developed film several days later. One of the rolls was badly underexposed and nearly black. The other two rolls were visible, although slightly underexposed. Anger mailed the latter two films to

Dr. Gebhardt of the Kinsey Institute, having previously written him and informed him that he was on the trail of footage which he thought would interest the institute. Anger mailed the underexposed roll to defendant.

Dr. Gebhardt returned the films to Anger, who mailed them to defendant.

Anger's next contact with defendant occurred in early November. The two men dined at a San Francisco restaurant and defendant stated during the course of the dinner that he had edited the films which Anger had developed for him, and he also stated that he intended to make more films of a sadomasochistic nature. Anger again volunteered to have them developed, and told defendant to mail them to Anger's San Francisco address. Defendant indicated that an individual who would play the role of the masochist in a future film was coming from out of state. When Anger again stated that the Kinsey Institute would be interested in the films, defendant expressed a willingness to donate to the institute both the films he had already made and those he intended to make. There was never any discussion of making the films available to the general public or to anyone other than the Kinsey Institute.

After dinner, defendant and Anger went to defendant's home, where the two rolls of film which he had edited were projected. Anger saw that the two rolls had been spliced together and that a shot of a solitary figure wielding a whip had been taken from the end of one roll, where it had previously appeared, and had been cut into several pieces and reinserted at various places in the two combined rolls. This film constitutes the basis for the second conspiracy count and will hereafter be referred to as the ''horizontal'' film.

At the trial Anger identified defendant as the man wielding the whip.

Anger's next contact with defendant occurred in mid-November, when he received two rolls of film from him. Anger deposited the films at Schaefer's Camera Store in San Francisco, using the fictitious name of ''Jackson'' and giving a false address. He subsequently returned to the camera shop and was told that only one of the films had thus far been developed and returned to the shop. He paid the developing fee and picked up the film.

The other roll of film had been sent by the camera shop to the Eastman Kodak Company in Palo Alto for processing. The company contacted the Palo Alto Police Department and

projected the film for certain police officers and prosecuting attorneys, who confiscated the film.

A dummy roll of film was left at Schaefer's Camera Store. On November 20, Anger picked up this film and was apprehended by the police of San Francisco. Anger was taken to the Hall of Justice where he was questioned concerning the defendant and the films.

Later that day, the Santa Clara County district attorney's office obtained a warrant authorizing a search of defendant's home for whips and other instruments of torture.

Anger and several police officers of San Francisco then drove to the Santa Clara County district attorney's office, arriving there about 7:30 p.m. They viewed the film which Inspector Nieto of San Francisco had obtained from Eastman.

This film, which will henceforth be referred to as the "vertical" film, constituted the basis for the first conspiracy count and the aggravated assault charge. It shows a gagged and naked man strung up in an unfinished room, receiving a beating with whips and lashes administered by a man whom Anger identified as defendant. There are marks on the victim's buttocks, the small of his back and further up on his body. The film contained no splices.

After viewing the film, all of the officers proceeded to defendant's Sunnyvale residence, arriving there at approximately 9 p.m. When defendant opened the door, he was informed of the search warrant, it was read to him and then handed to him. The officers then entered the house and observed that the living room was in semi-darkness and that a movie screen was set up in the living room, and a projector was on the dining room table. Two canisters of film were on the table by the projector. One canister contained the "horizontal" film, and the other contained a travelogue entitled "Fire Island," which defendant had made on the east coast.

Nieto accompanied defendant into the bedroom and was subsequently joined by Logan of the district attorney's office, who advised defendant of his rights to counsel and to remain silent. Logan then asked defendant the name of the individual who was strung from the beam in the "vertical" film. Defendant replied that he did not know his name and that he had met him in a San Francisco bar. In response to further questioning, defendant said that the film had been made in an unfinished room in the Sunnyvale house. He further stated that no third party was present when the film was made, and

automatic camera settings were used. He then refused to say anything further until he had consulted an attorney.

Defendant was subsequently questioned by Nieto. The man in the ''vertical'' film was an individual whom he had met either at a ''gay'' bar or at Foster's. Defendant thought his name was ''George,'' but did not know his present whereabouts. The man approached him and stated that he was an ''M'' looking for an ''S.'' The man thereafter came to defendant's home and voluntarily submitted to the beating. Defendant admitted that he was a well-known sadist and stated that he was one of the best in the business. When asked about the white substance on the face of the victim in the film, defendant stated that it was adhesive tape. He subsequently accompanied Nieto into the unfinished room in his house and identified the studs to which the victim's feet had been anchored during the filming.

Lowell Bradford, Director of the Santa Clara County Laboratory of Criminalistics and a qualified expert, testified that he had extracted certain sections from the ''vertical'' film by way of color slides which were then made into prints. This film, as above noted, contained no splices. His examination of the prints taken from a ' representative area'' of the film led him to the conclusion that the camera could not have been stopped so as to allow for the application of cosmetics and that the marks and welts which appeared on the victim during this portion of the film occurred progressively from frame to frame in slow development and were not the result of any retouching. Bradford had made a similar examination of a representative area of the ''horizontal'' film and had concluded that the welts on the victim had progressively developed during uninterrupted sections of the film without any indication of camera stops during which cosmetics could have been applied. There was no evidence that either the ''vertical'' or ''horizontal'' films had been retouched and Bradford was of the opinion that both films truly and correctly represented what was before the camera at the time. Edward Chong, senior county photographer, and Rudolph Stohr of the Eastman Kodak Company, were of the same opinion as to the absence of retouching and the accurate depiction of the scene before the camera.

On cross-examination, Bradford admitted that he had never examined defendant's camera, a Bolex, and was generally unfamiliar with that type of camera. With the exception of one stop early in the film, his notes indicated no other distinct

stops in the "vertical" film. He saw no interruption in the continuity of action and did not know whether the clear frames were actual stops or were attributable to a shutter fault. Since he had not examined the camera, he did not know whether it had any such defect.

Bradford had also performed a laboratory examination of the riding crop, belt, cane and lash used to strike the victims in the two films and had been unable to detect any traces of blood or cosmetics.

Defendant testified on his own behalf and admitted making both films in his home. The man who had been strung up in the "vertical" film had telephoned defendant after he had let it be known in the San Francisco "underground" that he wanted volunteers for sadomasochistic films to be sent to the Kinsey Institute. Defendant arranged to meet him at the San Jose bus depot and drove him to his Sunnyvale home. After the filming had been completed, defendant drove him back to the bus depot in the "same condition he came in." During the course of the filming, which took some four hours, defendant strung the man up with hospital restraints and struck him lightly with a riding crop, pulling his punches just before striking the man's body. He stopped the camera periodically and applied cosmetics. Defendant had coached the man to move violently so as to make the film seem realistic.

Defendant's testimony as to his arrest and the search of his home varied considerably from that of the officers.

John Barnes, a professional photographer, testified for the defense and stated that defendant's camera was of a type which could be stopped without any indication of stoppage, such as a blank frame. The prosecution established that Barnes had been convicted of a felony.

Dr. Robert Malone, a surgeon and physician whose practice included serving as team physician for a high school football team for a period of 10 years, was of the opinion that the marks on the victims in the "vertical" and "horizontal" films could have been caused only in part by the blows inflicted during the course of said films; that as to the "vertical" film, the dark coloration which appeared after the initial redness would not show up until at least 12 hours after the blow or trauma and certainly not within a period of a few minutes, as depicted in the film. The doctor testified at length as to the effect of the body being struck a violent blow in support of his opinion. If he were to assume that the marks did accurately depict the victim's reaction to the blows depicted in the film, his medical opinion would be that there

would of necessity have been a breaking of the skin and some bleeding, which would be detectable on the instruments used to inflict the beating. He could conceive of no physiological or medical explanation for this change and believed that cosmetics must have been applied to the surface of the skin.

Defendant challenges the validity of his conviction of conspiracy and assault on numerous and diverse grounds. However, as far as the counts of conspiracy are concerned, it is necessary to discuss only one of defendant's arguments.

■ Defendant correctly points out that in the recent case of *In re Klor* (1966) 64 Cal.2d 816 [51 Cal.Rptr. 903, 415 P.2d 791], the court held that section 311.2 of the Penal Code does not penalize the mere *preparation* of obscene material without the intent to distribute or disseminate such material. The court reasoned that if the statute were to be construed as a prohibition against mere preparation, it would interdict individual expression in a manner violative of the First and Fourteenth Amendments to the federal Constitution. The court concluded that "No constitutionally punishable conduct appears in the case of an individual who prepares material for his own use or for such personal satisfaction as its creation affords him" (p. 821).

In the *Klor* case, the trial court had instructed the jury that it should convict petitioner if it found that he had *either* prepared obscene material *or* had possessed it with intent to distribute. After the judgment of conviction had become final, petitioner sought a writ of habeas corpus. Although the court pointed out that petitioner, who was attacking the judgment collaterally, had the burden of showing that he had not been tried and convicted for violating the valid part of the statute, the court held that this burden had been met because the evidence of preparation was essentially uncontradicted and the evidence of intent to distribute was extremely weak.

In the instant case, defendant was convicted of two counts of *conspiring* to violate section 311.2. It is axiomatic that if he could not be found guilty of the substantive offense without possessing intent to distribute the material in question, he could not be found guilty of conspiring to violate that section in the absence of evidence that he and one or more other persons entered into an agreement to prepare *and distribute* obscene material.

The evidence in the present case, as in *Klor,* leaves no doubt that it was defendant who prepared the two films. Defendant admitted that he did so and testified at length regarding the

photographic and acting techniques employed. However, the record is utterly devoid of any evidence that he and another individual ever agreed to distribute or exhibit the films to anyone other than a scientific institute which would presumably be unaffected by any prurient appeal which the films allegedly possessed. Although the record does reveal that either one or two unidentified individuals enacted sadomasochistic roles in the earlier "horizontal" film, there is not one shred of evidence suggesting that either of these individuals ever discussed with defendant the use which he intended to make of the films. For all that appears in the record, these individuals may well have been totally unconcerned with defendant's purpose in making the films. The evidence similarly fails to reveal that defendant ever discussed his motives for filmmaking with the unidentified individual who played the role of the masochist in the "vertical" film, except that defendant had "let it be known" that the film was intended for the Kinsey Institute. The evidence pertaining to defendant's dealings with Anger likewise fails to show that the two men ever discussed distributing or exhibiting the films to anyone other than the Kinsey Institute.

The People's position with regard to the evidence allegedly proving the existence of a conspiracy merely serves to emphasize the total lack of any such proof. The People place no reliance upon defendant's dealings with Anger but assert only that "The jury could properly infer that the parties who came to [defendant's] home for the purpose of participating in his movies, and did participate in the movies, agreed to violate the law." This argument begs the question. Although it is doubtless true that these individuals' participation in the films supports an inference that they did so by prearrangement and had thus conspired with defendant to *prepare* the films, preparation and distribution are obviously not the same, and an intent to do both is an essential element of the conspiracy charges. To hold that an agreement to assist in the preparation of films must also constitute an agreement to distribute the films would utterly vitiate the holding of the *Klor* case.

In the light of the foregoing, the evidence is insufficient as a matter of law to support a finding that defendant and another conspired to distribute or exhibit either of the films subject of the conspiracy charges. Moreover, even if it could be said that the record did contain a legally sufficient quantum of evidence to that effect, reversal would still be required by

virtue of the trial court's having given jury instructions of the type condemned in the *Klor* case.

In the instant case, the jury was instructed that:

"Every person who knowingly prepares *or* distributes any obscene matter is guilty of a crime." (Italics supplied.)

"It is a complete defense to the preparation *or* distribution of obscene matter if the obscene matter is prepared or distributed, as the case may be, in aid of a legitimate scientific or educational purpose." (Italics supplied.)

"It is a complete defense to *the crime of Conspiracy to prepare or distribute obscene matter* if the conspiracy was entered into for the purpose of preparing or distributing such matter in aid of legitimate scientific or educational purposes." (Italics supplied.)

"[I]n the crime of Conspiracy to violate Section 311.2 of the Penal Code, a necessary element is the existence in the mind of the perpetrators of the specific intent to prepare *or* to distribute obscene matter and unless such intent so exists, that crime is not committed." (Italics supplied.)

We are compelled to conclude that the above instructions must have led the jurors to believe that intent to distribute was not an essential element of the conspiracy charges and that conviction could result from a mere finding of intent to prepare obscene material. Although the People place great reliance upon the fact that the court did give one correctly worded instruction to the effect that "A conspiracy is an agreement between two or more persons to commit a crime, to wit: Preparing *and* Distributing Obscene Matter . . . ," (italics supplied) we are satisfied that this solitary instruction, which merely paraphrases section 311.2 of the Penal Code, could not have overcome the effect of the four incorrect instructions set forth above. Moreover, the prosecutor effectively eliminated any conceivable benefit which could have resulted from the one correct instruction by stating, during his argument to the jury, "We always charge in the conjunctive. It is just pleading rule. You don't have to worry about it. We charged prepare and distribute. We are allowed to prove in the disjunctive. This, that is we can prove that he conspired to prepare or conspired to distribute. Either one is illegal. It is a pleading matter. You will see that from the instructions the Court gives you. . . ." "We can prove that he conspired with another person to prepare, or to distribute. Either one. They are both illegal. We don't have to prove that he conspired to do both. You will see that from the instructions."

Defendant's conviction of aggravated assault was based upon the beating depicted in the "vertical" film. Defendant contends that said film should not have been admitted into evidence over his objection that it was not properly authenticated. He also asserts that even if the film was properly admitted into evidence, the prosecution still failed, as a matter of law, to prove the commission of an aggravated, as opposed to a simple, assault. We do not agree.

Two prior California cases have held that photographs or films are admissible as probative evidence in themselves if they are authenticated by a showing that they correctly depict what they purport to represent. In *People* v. *Doggett* (1948) 83 Cal.App.2d 405 [188 P.2d 792], the court held that the photographs in question, although not authenticated by the person who took them, were properly admitted into evidence where there was unimpeached expert testimony that they were not "composite" or "faked" and there was an entire absence of any evidence which might tend to raise the slightest doubt about the matter. The *Doggett* holding was reaffirmed in *People* v. *Bowley* (1963) 59 Cal.2d 855 [31 Cal. Rptr. 471, 382 P.2d 591, 96 A.L.R.2d 1178], where the court held that even though a film cannot speak for itself as to its own authenticity, it may become probative once it has been shown, either by the testimony of the person who made it or by one who is otherwise qualified, that it is accurate and truly represents what it purports to show.

In the instant case, the testimony of Stohr, Chong and Bradford, upon which the People rely, was to the effect that the "vertical" film had not been retouched, showed no use of cosmetics, and accurately represented the scene before the camera. We are satisfied that the testimony of these experts, believed by the jury as demonstrated by its verdict, sufficiently authenticated the film for all purposes and that defendant's contention that it was not established that the entire beating had not been faked and the camera deceived, fails because defendant's evidence only raised a conflict which was decided adversely to him, with the result that the conviction of aggravated assault must be upheld. The jury was properly instructed as to expert testimony in accordance with section 1127b of the Penal Code.

There is no merit to defendant's contention that where injuries are actually inflicted, the measure of the likelihood of great bodily injury resulting from the assault is demonstrated by the injuries actually inflicted and that in the

absence of corroborative medical testimony, the "vertical" film itself could not support his conviction of aggravated assault. There is likewise no merit to his contention that the court ought to have instructed the jury that the likelihood of great bodily injury from a blow is demonstrated solely by the injury actually inflicted.

An aggravated assault, like any other assault, may be committed without the infliction of any physical injury. (*People* v. *Day* (1926) 199 Cal. 78, 85 [248 P. 250].) *People* v. *Fuentes* (1946) 74 Cal.App.2d 737 [169 P.2d 391], upon which defendant relies, has never been followed and has been distinguished six times and explained once. In the recent case of *People* v. *Muir* (1966) 244 Cal.App.2d 598, 603-604 [53 Cal. Rptr. 398], the court discussed the case at length and expressed the view that it "is and always was out of tune with the law on the crime of assault 'by any means of force likely to produce great bodily injury.' " (P. 603.) The court concluded that the question of whether or not the force used was such as to have been likely to produce great bodily injury was one of fact for the jury to determine on all the evidence "including but not limited to the injury inflicted" (p. 604).

Since the "vertical" film was properly authenticated, it was itself sufficient to support the jury's finding of aggravated assault, and the prosecution was not required to produce medical testimony as to the extent of the injuries actually inflicted upon the victim nor to instruct the jury in accordance with defendant's erroneous view of the law.

■ Defendant also contends that the consent of the victim is an absolute defense to the charge of aggravated assault and that the trial court erred in instructing the jury to the contrary. This argument cannot be sustained.

Although both parties concede that they were unable to find any California case directly in point, consent of the victim is not generally a defense to assault or battery, except in a situation involving ordinary physical contact or blows incident to sports such as football, boxing or wrestling. (See 1 Witkin, Cal. Crimes (1963) § 171, p. 163, and other authorities therein cited.) It is also the rule that the apparent consent of a person without legal capacity to give consent, such as a child or insane person, is ineffective. (1 Witkin, Cal. Crimes (1963) § 173, p. 165.)

It is a matter of common knowledge that a normal person in full possession of his mental faculties does not freely consent

to the use, upon himself, of force likely to produce great bodily injury. Even if it be assumed that the victim in the "vertical" film did in fact suffer from some form of mental aberration which compelled him to submit to a beating which was so severe as to constitute an aggravated assault, defendant's conduct in inflicting that beating was no less violative of a penal statute obviously designed to prohibit one human being from severely or mortally injuring another. It follows that the trial court was correct in instructing the jury that consent was not a defense to the aggravated assault charge.

■ Defendant asserts that the court ought to have excluded from evidence the verbal statements which he made to the police on the evening of November 20, 1964, during the interrogation conducted at his Sunnyvale home. This contention clearly goes to the validity of the aggravated assault conviction, since defendant admitted, during the course of said interrogation, that he was the man administering the beating in the "vertical" film.

Defendant first asserts that the statements were inadmissible because the product of an illegal search which exceeded the scope of the warrant and involved the seizure of various items which were not specified in the search warrant.

In *People* v. *Faris* (1965) 63 Cal.2d 541 [47 Cal.Rptr. 370, 407 P.2d 282], the sole case upon which defendant relies, the police arrested one Yokum and, six hours later, entered the apartment where they believed he lived and conducted a thorough search without a warrant. Defendant entered while the search was in progress and, upon being confronted with stolen property found in the apartment, made certain incriminating admissions. The court held the search unlawful, since it was made without a warrant, was not consented to and was not incidental to Yokum's arrest. The court further held that the statements made by defendant during the course of the illegal search were inadmissible as a product of the search because "the connection between defendant's responses and the illegal search was not ' ". . . so attenuated as to dissipate the taint" ' of illegality" (p. 546).

In the instant case, the factual situation is totally different from that presented in the *Faris* case. The officers had obtained a valid search warrant before proceeding to defendant's residence and he has failed to demonstrate that he made any incriminating statements as a result of being confronted with items other than those described in the warrant. Moreover, the officers had probable cause to arrest defendant when

they proceeded to his residence and the seizure of items other than those described in the warrant could be justified as incidental to the arrest. Since the officers did have probable cause to arrest defendant, they were also entitled, independent of any search, to question him after properly advising him of his rights.

Defendant also contends that the incriminating statements ought to have been excluded on the ground that they were obtained in violation of *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. This contention is meritless, since the testimony favorable to the prosecution shows that defendant was adequately advised of his right to counsel and his right to remain silent before he made any incriminating statements. *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R. 3d 974], does not apply to trials commenced before June 13, 1966, the date on which that case was decided. (*Johnson* v. *New Jersey* (1966) 384 U.S. 719 [16 L.Ed.2d 882, 86 S.Ct. 1772]; *People* v. *Rollins* (1967) 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].)

Defendant next asserts that the trial court committed prejudicial error in failing to order a daily transcript. In noncapital cases, the ordering of a daily transcript is within the discretion of the trial judge. (*People* v. *Jendrejk* (1957) 152 Cal.App.2d 462, 468 [313 P.2d 881]; *People* v. *Morgan* (1956) 140 Cal.App.2d 796, 806 [296 P.2d 75].) The record in the present case fails to show that such discretion was abused.

Defendant contends that the court erred in failing to define the word "battery" for the jury and in failing to give a sufficiently clear explanation of the difference between simple and aggravated assault. Neither contention is meritorious. Defendant did not request an instruction on battery and, in any event, the court could properly refuse such an instruction. (*People* v. *McCaffrey* (1953) 118 Cal.App.2d 611, 618-619 [258 P.2d 557].) The court's instructions on the difference between simple and aggravated assault were entirely adequate and were obviously understood by the jury, which found defendant guilty of simple rather than aggravated assault in connection with the "horizontal" film.

There is no merit to defendant's contention that the court should have instructed the jury that "where the subject matter of the evidence is not within the common knowledge of nonexpert witnesses, but is solely within the scientific knowl-

edge of medical experts, medical expert testimony is controlling over a layman's opinion in that regard.'' There was obviously no need for any such instruction.

Defendant also asserts that the prosecutor was guilty of prejudicial misconduct. However, the allegedly improper conduct upon which he relies consisted solely of attacks upon Anger's morals and repeated suggestions that the ''horizontal'' and ''vertical'' films were not intended for the Kinsey Institute. The conduct in question obviously related to the conspiracy charges only and could not conceivably have contributed to defendant's conviction of aggravated assault.

Defendant asserts that his verbal admissions to third persons ought not to have been admitted into evidence until the corpus delicti of the crime of assault had been established. However, he concedes that this contention must fail if this court should conclude that the ''vertical'' film was itself sufficient to establish the corpus delicti of the crime of assault. This court has already held that the film was properly authenticated and that it was not only sufficient to establish the corpus delicti of the crime of aggravated assault but to support defendant's conviction of that offense.

Defendant finally objects to the admission of Logan's hearsay testimony (1) that Anger had told him that defendant was a sadist of national reputation, and (2) that Lusher had told him that Corman had admitted that he was a homosexual. Assuming this testimony to have been improperly admitted, it could not conceivably have resulted in prejudice to defendant. He himself testified at length regarding his sadomasochistic tendencies. Moreover, the nature of the ''horizontal'' and ''vertical'' films could have left no doubt in the jurors' minds that defendant, who admittedly made both films, was a man of aberrant sexual tendencies.

The attempted appeal from the order denying a new trial is dismissed. The conviction as to aggravated assault is affirmed. The trial court is directed to vacate and set aside the convictions of conspiracy and the order of probation is vacated with directions to the trial court to reconsider the same in the light of our determination.

Agee, J., and Taylor, J., concurred.

A petition for a rehearing was denied May 26, 1967, and appellant's petition for a hearing by the Supreme Court was denied July 19, 1967. Peters, J., and Burke, J., were of the opinion that the petition should be granted.