Filed 5/21/13  P. v. Parker CA6
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CASSIDY LORIN PARKER,<br><br>    Defendant and Appellant. | H037709<br>(Santa Clara County<br>Super. Ct. No. CC947711) |

In this appeal, Cassidy Parker (appellant) challenges as defective a jury instruction on simple battery (Pen. Code, § 242) that was given and then modified by the court after a juror question was sent to the court during deliberations.  Appellant argues that the trial court's modification of the instruction removed from the jury's consideration the defenses of consent and accident to simple battery in violation of the constitutional guarantees of due process and a fair trial.  Appellant asserts that this court must reverse the judgment. For reasons that follow, we affirm the judgment.

*Facts and Proceedings Below*

On February 25, 2010, the Santa Clara County District Attorney filed an information in which appellant was charged with one count of assault with intent to

commit rape (Pen. Code, § 220, subd. (a), count one) and one count of sodomy by force, violence, duress, menace or fear (§ 286, subd. (c)(2), count two).[1]

The charges arose from an incident that occurred on December 27, 2008. The evidence at trial was as follows:

*Victim Jane Doe[2]*

On December 26, 2008, Jane and her friend Erica went to a bar in San Jose at around 11:00 p.m. Jane estimated that she drank four drinks at the bar. When the women left the bar they planned on going to a party. Erica drove Jane's car because Jane did not feel sober enough to drive. En route to the party the women got lost in East San Jose. The police stopped their car at about 2:19 a.m. on December 27 because the car was swerving; Erica was arrested for driving under the influence of alcohol. At the time, Jane was also under the influence of alcohol and officers told her that she could not drive.

Jane tried telephoning people that she knew lived in San Jose in order to find someone to take her home, and to stop her car from being impounded. Jane called appellant because they were not far from downtown San Jose. Appellant was one of the few people she knew who had a car. Jane had never been to appellant's house but knew that it was somewhere in San Jose. Jane explained to appellant that she needed a ride home; appellant agreed to pick her up. Approximately 10 minutes later appellant arrived with a friend. According to Jane the officers gave appellant and his friend the keys to her car and the friend moved the car; he did not tell her where he parked it.

Jane testified that when she went with appellant and his friend the plan was that they would take her home. However, they said that Santa Clara was too far and suggested that she sober up at appellant's house; Jane agreed. Jane remembered going upstairs to appellant's house. One of the first things that she did was to go into the bathroom; when she came out appellant gave her a blanket and told her to take a nap. As

---

[1]     All unspecified section references are to the Penal Code.

[2]     We refer to the victim in this case as Jane Doe to protect her anonymity.

soon as she sat on the couch appellant started to take off his clothes. Appellant started to lift up Jane's dress; she remembered appellant trying to spread her legs as she was on her back. Jane moved backwards on the couch and appellant tried to put his penis inside her. Jane was scared and told appellant to stop. At this point she was still wearing her underwear. She told appellant that she was scared of getting pregnant, and then told him that she had a sexually transmitted disease.

According to Jane appellant pushed her down onto her stomach, lifted her dress, pulled down her underwear and placed his penis in her "butt." Jane said that she started crying hysterically because it was painful; she told appellant to stop. At this point somebody came down the stairs and asked what was going on. According to Jane, appellant told him to " '[g]et the fuck upstairs.' "

When Jane's telephone rang she told appellant that it was an emergency and she needed to answer it. Appellant stopped what he was doing and she ran for her telephone. It was the officer that arrested her friend Erica; he called to relay a message to her. Jane did not tell the officer what had just happened because she was scared, but when he asked if she was okay she said "No." Jane arranged for the officer to call her back. When she finished the telephone call with the officer, she texted her niece and told her that she had been raped.

At some point appellant's friend returned and took Jane to her car. Appellant's friend had Jane's keys. When they got to her car, appellant's friend told Jane that if she needed anything she could telephone him, but he did not give her his telephone number as she said she was going to go to downtown San Jose. She drove to San Jose toward the jail. Again, the officer that had arrested Erica telephoned her; when he learned that she was driving, the officer told her to pull over. Jane did so in the area of 10th street and San Fernando. When the officer arrived she told him that she had been raped, but did not tell him who had raped her. The officer told her that she should report what had

3

happened. All she told him was that it was one of the people that had picked her up. Eventually, she left and drove home.

When Jane arrived at her apartment her niece was there. The niece encouraged her to get a rape test. Jane telephoned the police around 9 a.m. An officer took her to Valley Medical Center for laboratory work and blood tests. Hospital personnel checked her for injuries, removed her clothing and took photographs. Eventually, Jane returned to her apartment; she testified that she wanted to be left alone and was embarrassed. She was in a lot of pain and bleeding.

Jane testified that she remembered telling the officer that came to her apartment that she was screaming and crying hysterically during the assault.

*Hospital Examination*

Registered nurse Emily Trenado conducted a SART examination on Jane. Trenado testified that SART stands for Sexual Assault Response Team. Trenado collected swabs from Jane's right thigh, around her lips, and on both sides of her neck. It was stipulated that swabs of Jane's neck area had DNA from appellant.

Jane declined a full anoscope examination. Accordingly, Trenado performed a visual examination of Jane's anal area and took photographs. Jane complained of tenderness in that area. There was redness in the rectal area, but no evidence of bleeding. Trenado saw that when Jane was sitting she had one hip elevated. Emotionally, Jane was tearful and crying.

In Trenado's expert opinion, based on her observations of the injuries on Jane and the pain which she said she was experiencing, Jane's injury was consistent with anal sex. Trenado could not say whether the sex was consensual only that the injuries indicated that there was a "lack of cooperation."

*Appellant's Friend and Neighbor*

Oscar Barajas, appellant's friend and neighbor, testified that he had known appellant for between five and seven years. In December 2008, appellant lived across the

4

street from his house.  Barajas recalled some events related to this case.  He remembered leaving the house around 10:30 to go to a bar with appellant.  Barajas could not remember how many drinks appellant had.  The bar closed at 1:30 a.m., but Barajas remembered "hanging out" outside the bar with friends and leaving San Jose about 2:45 a.m.  Appellant was intoxicated.  As they were heading home they stopped to pick up some food.  Barajas was driving appellant's pick-up truck.  Just as they got to appellant's house, appellant received a telephone call.  Barajas was not really paying attention to the call, but half-way through the telephone conversation appellant asked him if they could go to pick up somebody.  Barajas was not happy about the idea because it was late and he had to go to work that day, but after considering that appellant had been drinking he changed his mind.

When they arrived in the area of Tully and Senter, Barajas parked the truck behind a CHP car.  He got out of the truck and went to talk to a CHP officer.  The officer asked him if he had had anything to drink and Barajas told him that he had not.  The officer explained that there had been a DUI stop and that one young woman was going to jail, but the other one needed a place to go to sober up.  The officer asked him to take the car involved in the stop and park it somewhere.  He got the keys from the young woman and parked the car about a block away.  When he returned to the scene he saw appellant talking with the woman who was crying; he returned her keys to her.  Appellant decided that he would take the woman to his home and they would both sober up; in the morning he would drive her to fetch her car.

Barajas drove appellant and the young woman to appellant's home.  The young woman talked about how she should have been the one going to jail and she should be the first person that her friend should see when she walked out of the jail.  The journey to appellant's home lasted about five minutes.  When they arrived all three walked up the stairs and entered the home.  They sat on the couch and started watching television, but Barajas was tired and left shortly thereafter.

Barajas recalled that the young woman was under a blanket because it was cold. He saw her go into the bathroom and when she came out he gave her his food and left. He thought that it was around 3:45 a.m. when he left. He walked across the street to his house and went to bed. About 45 minutes later he received a telephone call from appellant asking him to come to get the young woman because she was " 'freaking out' " about her friend being in jail. Barajas walked across the street and found appellant and the young woman outside. The young woman was crying about her friend in jail similar to when he first met her. Barajas asked her if she was "okay," and she said she was "fine."

Barajas drove the young woman back to her car. Again, Barajas asked her how she was and she replied that she thought she should be the first person her friend saw when her friend got out of jail; she blamed herself for her friend being in jail. The young woman was texting on her telephone as he was driving. When they got to her car, the young woman returned a sweater that Barajas had given her because it was cold, but he told her to keep it. He told her to call him if she needed anything else; she saved his telephone number in her telephone. Again, he asked her if she was fine, and she said she was; she got into her car and started it up. Barajas drove away.

*The DUI Stop—Deputy Elder*

Deputy Elder assisted with the DUI stop. Two young women were in the vehicle and both had been drinking. Deputy Plett arrested the driver and several times the passenger was offered a ride home because she could not drive the car; she had been drinking. The passenger chose to call a friend. A pick-up truck with two people arrived to pick up the passenger. The driver of the pick-up truck drove the car around the block to park it in a safe location so that it would not be towed. When he walked back he gave

6

the keys to the car to the passenger.[3] Deputy Elder testified that she could tell that the young woman had consumed alcohol but was not too intoxicated to care for herself.

Later, Deputy Elder had a conversation with Deputy Plett. He informed her that he had seen a text message from Jane on Erica's phone, which was in his possession, indicating that the two men who had picked her up left her on the side of the road near a bridge and she did not know where she was. Based on this information Deputy Plett had called Jane; when he asked her if she was okay and if he needed to send another deputy out to check on her, Jane told him that she was okay and had found another ride home.

*Deputy Plett*

Deputy Plett testified to the events of the December 27, 2008 DUI stop. At approximately 2:30 a.m. he stopped a car; he could not remember what he observed. He remembered the names of the people in the car as Jane and Erica; Erica was the driver. He testified that he conducted a full DUI investigation, which included administering field sobriety tests. He arrested Erica. Two other deputies arrived to assist—Deputy Elder and Deputy Cortez. Deputy Plett transported Erica to the jail and Jane and the car remained at the scene. He could not remember what happened to the car.

At some point, Deputy Plett used Erica's telephone to call people because Erica was concerned that she was not appropriately dressed to be released from the jail, and was worried that she would not have any transportation. Deputy Plett talked to Jane on the telephone; he estimated that it was sometime between 2:50 and 3:10 in the morning. Deputy Plett asked Jane to pick up Erica as Erica had requested. Jane asked if Deputy Plett could call her back. Jane "sounded rushed and kind of frantic," but he could not recall that she was crying. At the time, he did not think there was any cause for concern. The conversation lasted approximately 15 to 20 seconds. When asked by the prosecutor

---

[3]     Deputy Elder identified the young woman passenger as Jane.

what other words he could use for how Jane sounded, Deputy Plett testified "fearful" or "distraught."

When Deputy Plett telephoned Jane again, he learned that she was driving. She told him she was pulled over at the side of the road and he told her to stay there. Jane was still emotional when he talked to her; she said she wanted to pick up Erica. Eventually, Deputy Plett met with Jane in the area of 10th Street and San Fernando at approximately 5:15 a.m. Deputy Plett questioned Jane about her ability to drive; she responded that she had been raped. Jane was shaking and visibly upset. Jane did not tell Deputy Plett who had raped her or exactly where it happened. She said that she did not want to get anyone into trouble. Deputy Plett described Jane's responses as evasive; it appeared to him as if she did not want to talk about it. Deputy Plett was still concerned about Jane's ability to drive and so he asked her to blow into a PAS device. Jane just wanted to leave. Deputy Plett offered to get a victim advocate for Jane but she declined. Deputy Plett could not recall if Jane appeared to have been crying, but he did remember that her eyes were red and bloodshot.

*The Investigation*

In December 2008 San Jose Police Officer Justin Palmer was assigned to the sexual assault investigative unit. He received this case around December 31, 2008. He left a telephone message for Jane on January 6, 2009. However, he had to telephone her a few times before she returned his call. Jane did not keep appointments made for January 9 and January 12 or January 13. She told Officer Palmer that she needed more time to think about what to do.

On February 4, and February 5, 2009, Officer Palmer and Detective Kidwell met with appellant at his residence. They recorded two interviews they had with appellant outside the residence.[4] The recordings from both interviews were played for the jury.

---

[4]     Appellant was not aware that he was being recorded.

In the first interview, initially, appellant denied that anything happened and said that he did not know of any reason why his DNA would show up in Jane's vagina or anus. Toward the end of the interview, appellant admitted that some "stuff did happen." He explained that the reason he had not been forthright at the beginning of the interview was Jane's "girlfriend's boyfriend" did not like him. Appellant admitted that he had consensual vaginal sex with Jane; he did not remember having anal sex with her, but said that "they might have slipped out." He said that when Jane's telephone rang she asked him to stop; he said he did. Jane became hysterical about her friend and so he asked his friend to come to pick up Jane and take her to her car. His friend took Jane to her car and that was the last time appellant saw her.

In the second interview, again appellant denied having anal sex with Jane, but conceded that his penis "might have" gone into her anus, but he "did not stick it there on purpose."

*Jane's Niece*

Jane's niece testified that she remembered receiving a text message from her aunt at about 3:00 a.m. on December 27. The text said, " 'I was raped.' " When shown a photograph of her telephone by the prosecutor, the niece confirmed that it was her telephone, confirmed that the exact wording of the text was "I got raped" and that the text came in at 4:06 a.m. Jane's niece said that she got dressed and went to find Jane. She located her at Jane's apartment about 5 a.m. Jane was sitting on her couch watching television. According to the niece, Jane was distraught, bewildered, very emotional, and crying.

*David Knutson*

David Knutson was appellant's foster father. Appellant had lived with him for seven years and was living with him in December 2008. However, at the time of trial they were no longer living together.

9

Knutson testified that on one night after Christmas 2008 he saw appellant with a young blond woman. He did not know the woman's name and had not seen her before. Knutson explained that on that night he had gone to bed around 10 p.m., but woke up with a dry throat so he went to get something to drink. To get to the kitchen he had to go from his bedroom, which was down a hallway and through the living room. As he did so, he noticed appellant and his guest were on the couch. They were covered with a blanket; they appeared to Knutson to be "getting along fine." According to Knutson appellant and his guest were watching television and engaging in what he considered "some sort of foreplay" under the blanket; they were giggling and smiling.

When appellant saw Knutson he jumped up and told Knutson to go back to his room; Knutson could see that appellant was fully clothed. Since Knutson slept in his underwear and he did not want to embarrass appellant and his guest, Knutson went back to his room to put on a pair of shorts. At this time, the young woman did not appear to be in any distress; she did not speak to Knutson. After Knutson put on a pair of shorts he went back to the kitchen and then returned to his room; the young woman was still watching television and "having a good time" with appellant.

Knutson did not recall hearing a telephone ring after going back to bed. Nor did he remember doors opening and closing. He testified that he did not hear a woman crying in the early morning of December 27. When asked if anything to which he had testified was untrue because he was trying to protect appellant, Knutson replied, "None. None whosoever [*sic*]. If I would have heard a woman screaming in my house, I would have called the police."

On cross examination, Knutson conceded that when he spoke to a defense investigator in September 2009, neither the word "giggling" nor the word "laughing" was mentioned by him. Nor did he say anything about foreplay. Knutson admitted that he told the defense investigator that he did not know the girl's demeanor because he did not

see her face.  When asked by the prosecutor whether there was an internal stairway in the residence, Knutson confirmed that there was, but it went down into the garage.

The jury found appellant not guilty of assault with intent to commit rape, not guilty of the lesser included offense of assault (§ 240) and not guilty of sodomy by force or fear.  However, the jury did find appellant guilty of battery (§ 242).

Subsequently, defense counsel moved for a judgment of acquittal or in the alternative a new trial.  Counsel argued that the court had misdirected the jury as to the elements of battery and this adversely affected her client's substantive rights.  On October 14, 2011, the court denied the motion and denied the prosecutor's request that the court order appellant to register as a sex offender.  The court sentenced appellant to one year formal probation on the condition he serve 97 days in jail credit for time served.  The court imposed various fines and fees and ordered that appellant not have any contact with Jane.

Appellant filed a timely notice of appeal.  As noted, on appeal appellant asserts that the court erred when it instructed the jury on battery and then modified the instruction during jury deliberations in response to a jury question.

*Discussion*

*Alleged Instructional Error*

*Background*

On the afternoon of June 22, 2011, after the conclusion of the evidentiary portion of the trial, the court and counsel discussed the instructions to be provided to the jury. Defense counsel noted for the record her objection to the court's proposal to instruct on lesser included offenses.

Before argument, the court instructed the jury on the elements of the offenses with which appellant was charged; and as to count two, the court instructed the jury on battery as a lesser included offense.  Specifically, the court told the jury "The defendant is charged in Count 2 with sodomy.  The crime of simple battery is a lesser offense to that

11

of sodomy. [¶] To prove that the defendant is guilty of this crime, the People must prove that the defendant willfully and unlawfully touched [Jane] Doe in a harmful or offensive manner. [¶] Someone commits an act willfully when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain an advantage. [¶] The slightest touching can be enough to commit battery if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury or any kind."

During deliberations, the jury sent a note to the court, which read—"In the simple battery charge, can the term 'unlawfully' be defined?" On the record, out of the presence of the jury, the court noted that the jury had asked about the battery charge and stated "I believe that should have been deleted; and, Counsel, you both agree with me." Defense counsel answered, "Yes." The court told counsel that the reply to the question would be "That word should . . . have been deleted from the instruction. Please cross it out and ignore it." Defense counsel responded "Thank you."

Appellant argues that the trial court improperly modified the jury instruction for battery. He contends that by directing the jury to delete the term "unlawfully" from the instruction, the court removed an element of the offense from the jury's consideration and relieved the prosecution of its burden to prove each element of the charged offenses beyond a reasonable doubt in violation of his state and federal constitutional rights to due process as well as his Sixth Amendment right to a jury trial.

Respondent disagrees and counters that the claim of error is forfeited because defense counsel expressly agreed to the court's modification of the instruction. Respondent argues that appellant is estopped to complain of a purported error that counsel expressly agreed should be modified.

Appellant addresses this claim of forfeiture in his opening brief; he argues that if his attorney's agreement to the deletion of the word "unlawfully" from the battery

instruction forfeited this claim, defense counsel rendered ineffective assistance of counsel.

" 'When a defense attorney makes a "conscious, deliberate tactical choice" to [request or] forego a particular instruction, the invited error doctrine bars an argument on appeal that the instruction was [given or] omitted in error.' [Citations.]" (*People v. McKinnon* (2011) 52 Cal.4th 610, 675.)  "The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest.  If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal." (*People v. Wickersham* (1982) 32 Cal.3d 307, 330, disapproved on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 201.)  However, invited error will be found only if counsel expresses a deliberate tactical purpose in resisting or acceding to the complained-of instruction.  (*People v. Cooper* (1991) 53 Cal.3d 771, 830; *People v. Valdez* (2004) 32 Cal.4th 73, 115.)

The record does not support a conclusion that counsel expressed a deliberate tactical purpose in agreeing with the court that the word "unlawfully" could be deleted from the instruction—all counsel said was "Yes" when the court asked if counsel agreed to the deletion of the word.  We find it highly questionable that defense counsel would make a deliberate tactical choice to agree to a modification of an instruction that she expressly objected to in the first place.  Accordingly, we find no invited error here.[5]

Nevertheless, we cannot agree with appellant that the deletion of the word "unlawfully" from the instruction was error under the facts of this case.

Certainly, a "battery is any willful and unlawful use of force or violence upon the person of another."  (§ 242.)  Nevertheless, as this court has explained before, "battery does not require proof of unlawfulness separate from the use of force; lawfulness (justification) is an affirmative defense. [Citation]" (*People v. Johnson* (2007) 150

---

[5]    Since we address this issue it is not necessary to address appellant's argument that he received ineffective assistance of counsel.

Cal.App.4th 1467, 1482.) "Harmful or offensive contact, intentionally done, is the essence of battery (Rest.2d, Torts §18)." (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 383, p. 599.) "Any harmful or offensive touching constitutes an unlawful use of force or violence. [Citation.]" (*People v. Martinez* (1970) 3 Cal.App.3d 886, 889 (*Martinez*).)

For the touching not to have been unlawful, appellant must not have touched Jane willfully (i.e., willingly or on purpose) in a harmful or offensive manner. " ' "It has long been established . . . that 'the least touching' may constitute battery. In other words, *force* against the person is enough, it need not be violent or severe, it need not cause bodily harm or even pain, and it need not leave any mark." [Citation.]' " (*People v. Myers* (1998) 61 Cal.App.4th 328, 335.) Thus, the essence of the crime of battery is a touching which is objectively and subjectively perceived as harmful or offensive. (*Martinez*, *supra*, 3 Cal.App.3d at p. 889 [barefoot kick to shin is offensive].)

Relevant here, the jury instruction on simple battery provides: "The defendant is charged with battery [in violation of Penal Code section 243(a)]. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1 The defendant willfully [and unlawfully] touched *<insert name>* in a harmful or offensive manner . . . [¶] [AND [¶] 2 The defendant did not act (in self-defense/ [or] in defense of someone else/ [or] while reasonably disciplining a child).] [¶] Someone commits an act *willfully* when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage. [¶] The slightest touching can be enough to commit a battery if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind." (CALCRIM No. 960)[6]

---

[6] Judicial Council of California Criminal Jury Instruction 960.

14

As the bench notes to CALCRIM No. 960 indicate, ordinarily, the word "unlawfully" in CALCRIM No. 960 is deleted from the instruction unless there is evidence of self-defense, defense of another or reasonable discipline. (Judicial Council of Cal., Crim. Jury Instns. (2012) Bench notes to CALCRIM No. 960, pp. 757-758.) Thus, in the general sense, the court was correct that the word "unlawfully" should not have been given as there was absolutely no evidence that appellant was acting in self-defense or in the defense of others.

We examine jury instructions to determine whether the law was correctly conveyed to the jury. (*People v. Kelly* (1992) 1 Cal.4th 495, 525.) The question is whether there is a " 'reasonable likelihood' " that the jury understood the charge as appellant asserts. (*Ibid*.)

At the crux of appellant's argument is that in this case Jane consented to vaginal intercourse and that his penis entered Jane's anus by mistake. Thus, he argues in this situation the touching was not unlawful.

Certainly, the defenses of consent and mistake of fact were available to appellant with regard to battery. It is true that there are certain acts that so contravene public policy that consent is not recognized as a valid defense to an assault and battery charge. For example, voluntary mutual combat outside the rules of sport is a breach of the peace. Therefore, mutual consent is no justification and both participants may be found guilty of criminal assault and battery. (See *People v. Lucky* (1988) 45 Cal.3d 259, 291; 1 Witkin & Epstein, Cal.Criminal Law (4th ed. 2012) Defenses, § 96, p. 544.) If, however, the contact is of an "ordinary physical contact" and does not threaten bodily harm, consent is an available defense. (*People v. Samuels* (1967) 250 Cal.App.2d 501, 513.)

In accordance with these principles, it has been determined that consent of the victim may render an otherwise unlawful touching to be lawful because "[w]here a defendant reasonably believes the touching constituting the alleged assault was consensual he cannot be guilty because there is nothing unlawful about the physical

15

contact between the parties."  (*People v. Rivera* (1984) 157 Cal.App.3d 736, 742; see also *People v. Sanchez* (1978) 83 Cal.App.3d Supp. 1, 3 (*Sanchez*) [suggesting that the affirmative defense of a bone fide and reasonable belief by defendant that the victim impliedly consented and thereby would not be offended by the touching is available where defendant is charged with simple assault].)  Nevertheless, appellant had the burden of raising a reasonable doubt that he had a bona fide and reasonable belief that Jane impliedly consented and thereby would not be offended by the touching.  (*Sanchez*, *supra*, 83 Cal.App.3d Supp. at p. 3.)[7]

With regard to the sodomy charge, appellant chose a slightly different strategy in that the record indicates that appellant's defense was that if there was an act of sodomy it was not consensual, it was accidental.[8]  Specifically, defense counsel told the jury, "[s]o the defense is not saying that in some way [Jane] consented to anal sex.  We're . . . saying that she consented to vaginal sex and that anal sex accidentally happened.  So just want to make sure that you're clear on that point."  Subsequently, defense counsel told the jury "if you believe [appellant's] statement to the police, they had vaginal sex.  She consented to that.  And that's our position."  Then, defense counsel asserted that appellant told the police, " 'I did not put my penis in her anus, at least not on purpose.  It may have happened accidentally. . . .' "  As to the sodomy charge, defense counsel argued, "So sodomy . . . [n]ot an intentional act."

---

[7]    In such a situation, defense counsel would have needed to request a pinpoint instruction.  (*People v. Saille* (1991) 54 Cal.3d 1103, 1119 [a defendant is entitled upon request to a pinpoint instruction, which relates particular facts to a legal issue in the case or pinpoints the crux of a defendant's case].)

[8]    Pursuant to CALCRIM No. 252 [union of act and intent], the jury was instructed with regard to the sodomy charge that to find appellant guilty they had to find that appellant not only committed the prohibited act, but did so "with wrongful intent."  In addition, pursuant to CALCRIM No. 3404, the jury was instructed that appellant was not guilty of sodomy by force "if he acted . . . without the intent required for that crime, but acted instead accidentally."

16

As can be seen, appellant's position at trial was that because his penis might have accidentally entered Jane's anus during what was consensual vaginal intercourse, his act of sodomy was not unlawful because he lacked the intent to commit the crime. On appeal, appellant takes the position with regard to battery that his act of battery was not unlawful because his penis might have accidentally entered Jane's anus during what was consensual vaginal intercourse.[9] However, whether or not his act was lawful—in the sense that defense counsel suggested with regard to the sodomy charge—was fully covered by the battery instruction with which the jury was left after deletion of the word "unlawfully" from the instruction. That is, the jury had to decide if appellant touched Jane "willfully" in a harmful or offensive manner. As the battery instruction so informed the jury—"Someone commits an act willfully when he or she does it willingly or on purpose." We do not believe that it is reasonably likely that the jury would understand that if appellant's penis entered Jane's anus accidentally, it was done willingly or on purpose. Thus, the battery instruction, even after removal of the word "unlawfully" from the instruction, adequately conveyed the requisite concept vital to appellant's defense to battery. Despite appellant's protestations to the contrary, the court did not remove the issue of the lawfulness of his conduct from the jury's consideration as it related to battery and his defense to that charge.

We reject appellant's assertion that the jury's acquittal on the sodomy charge strengthens his claim that it was error to delete the word "unlawfully" from the battery instruction. We are not persuaded by appellant's argument for the simple reason that it is predicated on his assertion that the jury acquitted him of sodomy on the theory that the contact between his penis and Jane's anus was accidental. It may have been what defense

_____

[9]     Of course, battery is a general intent crime. (*People v. Colantuono* (1994) 7 Cal.4th 206, 217; *People v. Lara* (1996) 44 Cal.App.4th 102, 107.) The intent required for a general intent crime is simply the intent to do the act or omission in question. (*People v. Johnson* (1998) 67 Cal.App.4th 67, 72.) If appellant touched Jane's anus with his penis accidentally, he would lack the intent necessary for battery.

17

counsel argued, but the jury could have acquitted him of sodomy on the theory that there never was any penetration of Jane's anus.[10]

In sum, we reject appellant's argument that it was error for the trial court to delete the word "unlawfully" from the jury instruction on simple battery.

*Disposition*

The judgment is affirmed.

---

[10] Such a conclusion would not have been inconsistent with the evidence—if the jury disbelieved Jane that appellant sodomized her, but believed appellant's statement to the police that they engaged in consensual vaginal sex while Jane was lying on her stomach, and inferred from the SART nurse's description of what she saw on Jane's anus that appellant's penis touched Jane's rectal area but no penetration occurred and disbelieved appellant that the touching was accidental, the jury could have concluded that there was no sodomy but that a battery occurred.

                    _____

                    ELIA, J.

WE CONCUR:

_____

RUSHING, P. J.

_____

PREMO, J.