Filed 5/27/26  P. v. Benson CA3

<u>NOT TO BE PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

| | |
|---|---|
| THE PEOPLE,<br>          Plaintiff and Respondent,<br><br>          v.<br><br>DAMON ALLEN BENSON,<br>          Defendant and Appellant. | C100153<br><br>(Super. Ct. No. 62180971) |

Defendant Damon Allen Benson punished his girlfriend for cheating on him. After she drank enough alcohol to endure what he had planned for her, he punched her in the face, struck her with a paddle, used a stun gun on her body, and cut the shape of a swastika into her back.  He later broke into her partner's home and killed him.  A jury found defendant guilty of aggravated mayhem and torture, first degree residential burglary, and first degree murder with malice aforethought.  The trial court sentenced defendant to 25 years to life for murder plus four years for burglary.

Defendant raises two contentions on appeal:  (1) the trial court had a sua sponte duty to instruct the jury on mistaken consent to mayhem and torture; and (2) the consecutive burglary sentence was unauthorized.  The second contention has merit; the first does not.  We remand for resentencing and otherwise affirm.  Statutory references are to the Penal Code.

1

# FACTUAL AND PROCEDURAL BACKGROUND

## I. *Torture and Mayhem*

### A. Girlfriend's Testimony

Girlfriend began dating defendant in February 2021. While defendant intended to have a monogamous relationship, girlfriend told defendant she was pansexual and polyamorous. She also told him she was into "dominance and submission" and would make an effort to be monogamous.

In early July 2021, girlfriend had sex with Cameron Gabriel, a previous sexual partner. Defendant broke up with girlfriend for cheating on him, but they started communicating again about a week later. In those communications, defendant instructed girlfriend to be ready for him to pick her up so he could punish her. Girlfriend told him she would be ready but also told him not to hurt her.

On July 16, 2021, defendant took girlfriend to his place. They talked for about an hour, and girlfriend took her clothes off within the first 30 minutes, which was customary for her when she would visit defendant. Defendant "forcefully" told her to drink as much alcohol as she could, and girlfriend had four or five "large pours of limoncello." Girlfriend also complied when defendant told her to put out her hands. He bound her hands suspended her from a hook in the ceiling. Girlfriend was uncomfortable and did not want to be in this position, but she did what defendant asked because she was scared.

Defendant extinguished a cigarette on her neck and punched her in the face with a closed fist as she jumped back in pain. Somewhere between 15 and 39 closed-fist strikes followed. Defendant then struck her with a paddle, pulled hard on the inside of her nose with pliers, used a stun gun on her ovaries and back, and cut the shape of a swastika into her back with a machete knife. The events lasted about an hour. Girlfriend constantly begged and pleaded to be let down. After defendant let her down, she stayed the night

2

with him "against [her] will." The next day, defendant texted her "'you're mine for sure now,'" and she responded, "'I'm glad to be.'"

B. Defendant's Testimony

Defendant testified that girlfriend "liked danger boys" and "having sort of a dominant male who was jealous." On their first date, she told defendant she was into slapping, choking, biting, bondage, and being tied up and was not interested in being the dominant person. The first night they got together, they practiced choking and defendant held her down, both of which were girlfriend's ideas.

Throughout their relationship, girlfriend told defendant he didn't order her around enough. She instructed him to make her submit if she did something he did not like. He used his paddle on her "numerous times" before July 16, 2021, sometimes at her request. They also used the rope for tying hands or ankles and for hanging her from the ceiling a few times. During these activities, defendant would stop what he was doing if girlfriend said the word "mercy" or held her hands up as if she was praying.

After girlfriend admitted cheating on defendant, she told him it was the biggest regret of her life and hoped they could work things out. Defendant broke up with her but texted her a few days later to get back together. He told her he wanted to meet with her again and punish her for cheating on him. Defendant was explicit that he was going to inflict pain on her. At first, girlfriend said she wasn't into that, but her attitude changed after she arrived.

When they went to his bedroom, defendant told her she was going to be in extreme pain and advised her to drink a lot of alcohol before they got started. Girlfriend agreed. Defendant did not force her to drink. Defendant also drank to the point where he considered himself drunk. After girlfriend had drunk enough to be able to endure what he had planned for her, defendant asked her if she was ready to get started. She jumped off the bed, said "yes," and offered her hands for him to tie her up. Defendant claimed

3

girlfriend's testimony on what happened next was inaccurate in three ways: (1) the episode lasted 20 to 25 minutes; (2) she did not beg to be let down; and (3) he did not punch her 40 to 50 times. Girlfriend also never said "mercy" or made the sign she had used previously. In cutting her back, he was performing a pagan binding ritual that binds two souls together for eternity. They had previously discussed that the swastika represents a union between two divinities. And they had consensual sex before they went to sleep that night. Girlfriend later told him she "would have done anything to be with [him] again."

C. Instructions, Closing Arguments, and Verdict

The court instructed the jury on the elements of aggravated mayhem and torture using CALCRIM Nos. 800 and 810. Defendant did not request an instruction on mistaken consent. During closing arguments, defense counsel admitted that defendant inflicted the injuries underlying the mayhem and torture counts, but argued defendant was not guilty because the injuries were "part of their relationship" and "things that they experimented in." He told the jury it had the difficult decision of finding the line "between the dominance and submission type relationship, and torture/mayhem." He also argued that defendant lacked the requisite intent to commit mayhem or torture because he was intoxicated.

The jury found defendant guilty of aggravated mayhem and torture.

## II. *Murder and Burglary*

During a physical altercation with girlfriend on July 24, 2021, defendant demanded Gabriel's address and gathered a baton and a satchel containing a loaded pistol. After arriving at Gabriel's house, defendant kicked in the door and found Gabriel in his bedroom. Defendant struck Gabriel with the baton a few times and then fired the pistol seven times in his direction. Gabriel died from multiple gunshot wounds.

4

During closing arguments, the prosecution argued that defendant committed residential burglary because he entered Gabriel's home intending to commit murder. The jury found defendant guilty of first degree murder and first degree residential burglary. The trial court sentenced him to 25 years to life for murder and a consecutive term of four years for burglary. Defendant timely appeals.

## DISCUSSION

### I.   Sua Sponte Instruction on Mistaken Consent

Relying on *People v. Mayberry* (1975) 15 Cal.3d 143, 155, defendant contends the trial court prejudicially erred by breaching its sua sponte duty to instruct the jury on mistaken consent as a defense to the torture and mayhem counts. We disagree that such a duty existed.

A trial court has no sua sponte duty to instruct on doctrines of law that have not been established by authority. (*People v. Michaels* (2002) 28 Cal.4th 486, 529.) A *Mayberry* defense applies to sex offenses that have "as an essential element the absence of the victim's consent." (*People v. Andrews* (2015) 234 Cal.App.4th 590, 602.) Defendant cites no authority establishing consent, mistaken or otherwise, as an element of, or possible defense to, torture or mayhem. (See §§ 205, 206; *People v. Burton* (2006) 143 Cal.App.4th 447, 451-452 [torture]; *People v. Lee* (1990) 220 Cal.App.3d 320, 324-325 [aggravated mayhem].) The authorities we found indicate defendant's theory is either unsupported or has not received sufficient elucidation to constitute a general principle of law triggering a sua sponte duty to instruct. (See *People v. Samuels* (1967) 250 Cal.App.2d 501, 513-514 (*Samuels*) [consent not a defense to aggravated assault charge arising from severe beating inflicted for creation of sadomasochistic film]; *People v. Alfaro* (1976) 61 Cal.App.3d 414, 429 [consent not a defense to assault that results in great bodily injury]; *People v. Rivera* (1984) 157 Cal.App.3d 736, 742 [touching not unlawful where reasonable belief in consent present]; *People v. Flannel* (1979) 25 Cal.3d

5

668, 683 [no duty to instruct on undeveloped rule], superseded by statute on another ground as stated in *In re Christian S.* (1994) 7 Cal.4th 768, 776.)

Also, a *Mayberry* defense has a subjective and an objective component, and a *Mayberry* instruction is required only where both components are supported by substantial evidence. (*People v. Williams* (1992) 4 Cal.4th 354, 360-362.) As to the first component, there must be substantial evidence of the victim's equivocal conduct that served as the basis for the defendant's good faith but mistaken belief that the victim consented. (*Id.* at pp. 360-361.) As to the second component, the evidence must support the conclusion that the defendant's subjective good faith belief was objectively reasonable under the circumstances. (*Id.* at p. 361.) "[R]egardless of how strongly a defendant may subjectively believe a person has consented to [the act], that belief must be formed under circumstances society will tolerate as reasonable." (*Id.* at p. 361.) Here, although defendant acknowledges both *Mayberry* components, he does not explain how the second component was satisfied, specifically how his belief was formed under circumstances that society will tolerate as reasonable. Defendant does not meet his burden to show error. (See *People v. Garza* (2005) 35 Cal.4th 866, 881 [party attacking judgment has burden of affirmatively demonstrating error].) And we do not see how defendant could have an objectively reasonable belief that after drinking multiple pours of alcohol, girlfriend consented to being punched multiple times in the face, and after being so punched, she then consented to being stunned, struck with a paddle, and branded with a swastika using a knife. (See *Samuels, supra*, at 250 Cal.App.2d at pp. 513-514 ["a normal person in full possession of his mental faculties does not freely consent to the use, upon himself, of force likely to produce great bodily injury"].)

For these reasons, we find no merit to defendant's sua sponte contention.

6

## II. *Unauthorized Sentence*

The People concede defendant's argument the trial court erred under section 654 by imposing consecutive sentences for the murder and burglary convictions. We accept the People's concession.

Section 654 precludes multiple punishments for an indivisible course of conduct. (*People v. Centers* (1999) 73 Cal.App.4th 84, 98.) For example, when a defendant is convicted of burglary and the intended felony underlying the burglary, section 654 prohibits punishment for both crimes. (*People v. Islas* (2012) 210 Cal.App.4th 116, 130.) A claim of error under section 654 is nonwaivable. (*People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17.)

Here, murder was the felony underlying the prosecution's burglary theory, so the trial court erred by imposing consecutive sentences for both crimes. Because the trial court has discretion to decide which sentence should be stayed, remand is required. (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.)

## DISPOSITION

Defendant's sentence is vacated, and the case is remanded for full resentencing. (*People v. Buycks* (2018) 5 Cal.5th 857, 893.)  The judgment is otherwise affirmed.

/s/
MESIWALA, J.

We concur:

/s/
ROBIE, Acting P. J.

/s/
KRAUSE, J.